[No. 55866-8-I.   Division One.   June 26, 2006.]

THE STATE OF WASHINGTON, *Respondent*, v. MEE HUI KIM, *Appellant.*

28

*Richard A. Hansen* (of *Allen Hansen & Maybrown*), for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Lee D. Yates, Deputy,* for respondent.

¶1 SCHINDLER, J. — Mee Hui Kim was driving the wrong way on Highway 99 when she hit another car head on, killing the driver and seriously injuring the passenger in her car. Kim waived her right to a jury and stipulated to a bench trial based on documentary evidence. Kim appeals her conviction for vehicular homicide and vehicular assault. Kim contends the trial court erred in denying her motion to suppress the blood alcohol test results because (1) the police officer could not submit a blood sample without her consent and (2) the State failed to prove the Washington State Toxicology Laboratory (WSTL) followed its internal testing policies and procedures. Kim also contends the trial court abused its discretion in excluding testimony that her passenger might have given her a "date-rape drug."

¶2 We conclude the trial court did not err in denying Kim's motion to suppress the blood alcohol test results. As conceded below, because there was probable cause to arrest Kim for vehicular assault, the officer had the authority to obtain a blood sample from Kim for testing without her consent. Given the circumstances of the collision, the officer also had reasonable grounds to believe Kim was driving under the influence of alcohol and obtain a blood sample for testing without her consent. At the pretrial hearing on the admissibility of the blood alcohol test, the State presented prima facie proof that the WSTL complied with the Wash-

ington Administrative Code (WAC) in performing the test. We conclude the State did not also have to show that the test complied with the WSTL's internal policies and procedures for purposes of admissibility. We also conclude the trial court did not abuse its discretion in excluding testimony and argument that Kim was given a date-rape drug because there was no evidence to support her theory. We affirm.

## FACTS

¶3 Shortly after 2:00 AM on September 28, 2003, Mee Hui Kim was in Seattle driving her Kia Sephia the wrong way on Highway 99. Kim was traveling at 40 miles per hour going northbound in the southbound lanes of Highway 99. At that location in the downtown Seattle area, Highway 99 is a divided, limited access highway. Just after exiting the Battery Street tunnel north of downtown Seattle, Kim's car collided head on with a Honda Civic driven by Harrison Yu.

¶4 The closest points to enter Highway 99 the wrong way and travel northbound in the southbound lanes were all south of downtown and several miles from the collision. For all of the potential entry points, there are signs and significant physical barriers to prevent cars from entering Highway 99 in the wrong direction. A witness reported Kim was driving the wrong way for a considerable distance before entering the Battery Street tunnel.

¶5 The three occupants of the two cars were trapped until the police and medics arrived. After the police and medics arrived, Kim, her passenger, Dong Lee, and Yu were transported to Harborview Medical Center. Yu suffered catastrophic injuries and died a few days after the accident.[1] Lee sustained serious injuries, including a traumatic brain injury, a dislocated hip, a tibia fracture, and injuries to his hand and knee. Kim suffered the least significant injuries, principally a compound ankle fracture.

---

[1] Yu died as a result of a severe neck fracture.

¶6 Seattle Police Officer J.D. Huber responded to the scene of the collision and went to Harborview with the injured occupants. After Kim was treated by the emergency medical staff, Officer Huber introduced himself and told Kim she was under arrest for vehicular assault. Officer Huber told her she could also face charges for vehicular homicide. Kim kept interrupting Officer Huber to ask about Lee. Because Lee was nearby screaming in pain, Officer Huber bent down to talk to Kim. When Officer Huber bent down, he smelled alcohol on Kim's breath. Officer Huber advised Kim of her *Miranda*[2] rights, gave her the implied consent warnings for obtaining a mandatory felony blood draw, and told her that she had the right to an independent testing.[3] Kim said she wanted a lawyer. Officer Huber told Kim he would not ask her any questions but she did not have the right to refuse giving a blood sample for testing and she could talk to a lawyer later.

¶7 Kim's blood sample was taken at 3:45 AM, within two hours of the collision. A forensic toxicologist at the WSTL tested Kim's blood sample using the Head Space gas chromatography method. The results showed a blood alcohol level of 0.20 g/100 mL, which is two and one half times the legal limit. Kim's independent expert also tested Kim's blood sample. That test showed an almost identical result of a blood alcohol level of 0.199 g/100 mL.

¶8 The State charged Kim with vehicular homicide under RCW 46.61.520(1)(a), for driving while under the influence of alcohol and causing Yu's death, and with vehicular assault under RCW 46.61.522(1)(b), for driving while under the influence of alcohol and causing Lee's injuries.

¶9 Pretrial, Kim moved to suppress the results of the WSTL's blood alcohol test. Kim argued that Officer Huber did not have probable cause to arrest her for an alcohol related felony and the State did not establish that the toxicologist followed the "Head Space GC Protocol" in the

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] *See* RCW 46.20.308(2).

*Washington State Toxicology Laboratory Policies and Procedures Manual* (Head Space GC Protocol).[4]

¶10 At the pretrial hearing, the State presented the testimony of Officer Huber and Ann Gordon, a forensic toxicologist and the WSTL manager. The trial court denied Kim's motion that Officer Huber lacked the authority to obtain a blood sample from Kim for a blood alcohol test without her consent under RCW 46.20.308(1) and RCW 46.20.308(3). The court also decided the State met its prima facie burden of showing the blood alcohol test complied with the requirements of the WAC and was admissible.

¶11 Right before trial, the State moved to exclude any testimony or argument about Lee's relationship with Kim and the possibility that Lee gave Kim a date-rape drug the night of the accident. Because Kim presented no evidence to support her theory that Lee gave her a date-rape drug, the court granted the State's motion in limine. But the court ruled Kim could present evidence about her relationship with Lee and what transpired between them on the night of the accident.

¶12 After jury selection, Kim stipulated to a bench trial. In the stipulation, Kim waived her right to a jury and agreed to present her case to the court based on the police reports and the other documentary evidence. The trial court found Kim guilty of vehicular homicide and vehicular assault as charged and entered findings of fact and conclusions of law. The court imposed a standard range sentence of 41 months. Kim appeals.

## ANALYSIS

### 1. *Authority To Order a Blood Draw*

¶13 Kim relies on RCW 46.20.308(1) to argue the trial court erred in denying her motion to suppress the WSTL's blood alcohol test results. Under RCW 46.20.308(1) a police officer can obtain a blood sample taken without consent if

---

[4] Appellant's Br. App. A-1.

"at the time of the arrest, the arresting officer has reasonable grounds to believe the person had been driving or was in actual physical control of a motor vehicle while under the influence of intoxicating liquor or any drug. . . . " Kim contends Officer Huber did not have reasonable grounds to believe she was driving under the influence of alcohol until he smelled alcohol on her breath after placing her under arrest for vehicular assault and, therefore, was not entitled to obtain a blood sample without her consent.

■ ¶14 Kim's reliance on RCW 46.20.308(1) ignores the independent statutory authority to obtain a blood sample under RCW 46.20.308(3) and ignores her concession below. Under RCW 46.20.308(3) a police officer can obtain a blood sample for testing without consent when an individual is under arrest for vehicular assault or vehicular homicide. RCW 46.20.308(3) provides in pertinent part:

*If an individual is unconscious or is under arrest for the crime of* vehicular homicide as provided in RCW 46.61.520 or *vehicular assault as provided in RCW 46.61.522*, or if an individual is under arrest for the crime of driving while under the influence of intoxicating liquor or drugs as provided in RCW 46.61.502, which arrest results from an accident in which there has been serious bodily injury to another person, *a breath or blood test may be administered without the consent of the individual so arrested.*[5]

¶15 Kim conceded below that based on her disregard for the safety of others, she was lawfully under arrest for vehicular assault.[6] An arrest for vehicular assault is in and of itself a proper basis to obtain a blood draw for testing. RCW 46.20.308(3); *State v. Avery*, 103 Wn. App. 527, 534

[5] (Emphasis added.)

[6] RCW 46.61.522(1) provides that:

[a] person is guilty of vehicular assault if he or she operates or drives any vehicle:

(a) In a reckless manner and causes substantial bodily harm to another; or

(b) While under the influence of intoxicating liquor or any drug, as defined by RCW 46.61.502, and causes substantial bodily harm to another; or

(c) With disregard for the safety of others and causes substantial harm to another.

n.6, 13 P.3d 226 (2000). Because Kim was concededly under arrest for vehicular assault before Officer Huber smelled alcohol, he had the authority to obtain a blood sample under RCW 46.20.308(3) without Kim's consent.

¶16 In addition, we agree with the trial court that given the circumstances of the collision, Officer Huber had reasonable grounds to believe Kim was driving under the influence of alcohol or drugs under RCW 46.20.308(1) before he smelled alcohol on her breath and to obtain a blood sample without her consent. The collision occurred shortly after the bars closed at 2:00 AM; Kim had to overcome a number of significant physical barriers to get onto Highway 99 and drive in the wrong direction; and she drove the wrong way for some distance.

¶17 As an alternative argument, Kim contends Officer Huber did not advise her that she had the right to alternative independent testing under RCW 46.20.308(2). RCW 46.20.308(2) requires the officer to inform the person of "his or her right to have additional tests administered by any qualified person of his or her choosing." But contrary to Kim's contention, Officer Huber testified that he gave Kim the implied consent warnings for a mandatory felony blood draw and advised her that she had the " 'right to additional tests' administered by a qualified person of her choosing." The trial court also entered an undisputed finding that Officer Huber advised Kim of the implied consent warnings "including her right to have additional blood tests." Unchallenged findings of fact are verities on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

¶18 We conclude that Officer Huber had the statutory authority to obtain a blood sample without Kim's consent and the trial court properly denied Kim's motion to suppress the results of the WSTL's blood alcohol test.

### 2. *Blood Alcohol Test*

¶19 Kim also argues the trial court erred in admitting the blood alcohol test results because the State did not establish that WSTL followed the testing procedures in its

Head Space GC Protocol. Specifically, Kim points to the State's failure to show that preparation of the volatile standards in the "Alcohol Standard Logbook" met the requirements in the Head Space GC Protocol.

¶20 This court reviews a trial court's ruling on the admission of a blood alcohol test result for abuse of discretion. *State v. Hultenschmidt*, 125 Wn. App. 259, 264, 102 P.3d 192 (2004); *City of Seattle v. Clark-Munoz*, 152 Wn.2d 39, 44, 93 P.3d 141 (2004). A court abuses its discretion when such discretion is exercised on untenable grounds or for untenable reasons. *Hultenschmidt*, 125 Wn. App. at 264.

¶21 To convict Kim of vehicular homicide or vehicular assault, the State had to prove that Kim had been driving while "under the influence of intoxicating liquor or any drug." RCW 46.61.520(1)(a) (vehicular homicide); RCW 46-.61.522(1)(b) (vehicular assault). RCW 46.61.502(1)(a) defines driving while under the influence of alcohol as "an alcohol concentration of 0.08 or higher as shown by analysis of the person's breath or blood made under RCW 46.61.506" within two hours after driving.

¶22 At the pretrial hearing on admissibility of the blood alcohol test results, the State presented the testimony of Ann Gordon, a forensic toxicologist and the WSTL manager, to show the test complied with the WAC requirements. During cross examination, the defense asked about the Alcohol Standard Logbook and argued the information from the logbook was necessary to determine whether the WSTL properly performed the blood alcohol test. Gordon testified that the Alcohol Standard Logbook was "available at the laboratory"; that the alcohol standards were prepared every week, well within the expiration periods; and that the blood alcohol test was performed according to the Head Space GC Protocol.

¶23 The trial court ruled the State met its burden of showing the test performed by the WSTL complied with the WAC regulations governing blood alcohol testing and the results were admissible. The court concluded that any questions regarding compliance with the WSTL's Head

Space GC Protocol went to the weight rather than the admissibility of the evidence. Because Gordon testified that the logbook was available at the WSTL, the court said that it would allow Kim the opportunity to renew her objection to the admissibility of the test results.[7]

■ ¶24 RCW 46.61.506(3) requires that blood alcohol testing be performed by a qualified analyst according to a method approved by the state toxicologist:

> Analysis of the person's blood or breath to be considered valid under the provisions of this section or RCW 46.61.502 or 46.61.504 shall have been performed according to methods approved by the state toxicologist and by an individual possessing a valid permit issued by the state toxicologist for this purpose. The state toxicologist is directed to approve satisfactory techniques or methods, to supervise the examination of individuals to ascertain their qualifications and competence to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the state toxicologist.

■ ¶25 As directed by the legislature in RCW 46.61.506, the state toxicologist promulgated regulations governing blood alcohol tests in chapter 448-14 WAC. The WAC regulations do not detail the approved testing methods but rather outline the criteria any approved method must meet. *See* WAC 448-14-010;[8] *State v. Clark*, 62 Wn. App. 263, 268, 814 P.2d 222 (1991). The regulations require that any

---

[7] It does not appear from the record that additional evidence was presented or that Kim renewed her objection.

[8] WAC 448-14-010, titled "Criteria for approved methods of quantitative analysis of blood samples for alcohol," states, in part:

The blood analysis procedure should have the following capabilities:

(1) Precision and accuracy.

(a) The method shall be capable of replicate analyses by an analyst under identical test conditions so that consecutive test results on the same date agree with a difference which is not more than 3% of the mean value of the tests. This criterion is to be applied to blood alcohol levels of 0.08% and higher.

(b) Except for gas chromatography, the method should be calibrated with water solutions of ethyl alcohol, the strength of which should be determined by an oxidimetric method which employs a primary standard, such as United States National Bureau of Standards potassium dichromate.

testing method must meet "strict standards for precision, accuracy, and specificity." *State v. Schulze*, 116 Wn.2d 154, 167, 804 P.2d 566 (1991). Any approved testing method must also be "capable of replicate analysis" and must include a control test and a blank test. WAC 448-14-010, -020.

¶26 To introduce the results of a blood alcohol test, the State has the burden of proving that the analysis was performed in compliance with the regulations contained in chapter 448-14 WAC. *State v. Reier*, 127 Wn. App. 753, 756, 112 P.3d 566 (2005), *review denied*, 156 Wn.2d 1019, 132 P.3d 735 (2006); *Clark-Munoz*, 152 Wn.2d at 48-50. If the testing method meets the requirements of the WAC regulations, "there is sufficient assurance of accuracy and reliability of the test results to allow for general admissibility of test results." *State v. Straka*, 116 Wn.2d 859, 870, 810 P.2d 888 (1991).

¶27 Kim relies on *Hultenschmidt*, 125 Wn. App. 259; *Clark-Munoz*, 152 Wn.2d 39; *Reier*, 127 Wn. App. 753; and *Straka*, 116 Wn.2d 859, to argue the State failed to show the WSTL blood alcohol test was performed according to an approved method because the State did not present evidence of the volatile standards in the Alcohol Standard Logbook. The premise of Kim's argument is that the Head Space GC Protocol establishes the method for a blood alcohol test. Based on this premise, Kim asserts the State must establish compliance not only with the requirements of chapter 448-14 WAC but also with the Head Space GC Protocol. We disagree with Kim's premise.

---

(c) The method shall give a test result which is always less than 0.005% when alcohol-free living subjects are tested.

(2) Specificity.

(a) On living subjects, the method should be free from interferences native to the sample, such as therapeutics and preservatives; or the oxidizable material which is being measured by the reaction should be identified by qualitative test.

(b) Blood alcohol results on post-mortem samples should not be reported unless the oxidizable substance is identified as ethanol by qualitative test.

¶28 The testing method used for Kim's blood alcohol test was gas chromatography. There is no dispute gas chromatography has been approved by the state toxicologist and complies with chapter 448-14 WAC. *Clark*, 62 Wn. App. at 267-69.[9] Although a blood alcohol test must strictly comply with the requirements of chapter 448-14 WAC, the WAC regulations only describe "the *criteria* any approved method must meet." *Clark*, 62 Wn. App. at 268. While the WAC regulations specify the general manner for conducting tests, the regulations do not describe every step of the procedure necessary to perform tests. As the court held in *Schulze*, compliance with the regulations in chapter 448-14 WAC meets the requirements of RCW 46.61.506(3) and a " 'cookbook' " detailing every step of the authorized testing procedure is not necessary. *Schulze*, 116 Wn.2d at 167. In addition, the defense is always entitled to challenge the accuracy of the test results by presenting evidence that the test did not comply with the laboratory's internal written policies or procedures. *Straka*, 116 Wn.2d at 875.

¶29 The cases Kim relies on are distinguishable. For example, in *Hultenschmidt*, the court held the blood alcohol test results were inadmissible because the State failed to prove that the defendant's blood sample contained an enzyme poison as required by WAC 448-14-020(3)(b). *Hultenschmidt*, 125 Wn. App. at 267. In *Clark-Munoz*, the Supreme Court concluded the breath test was inadmissible because the State failed to establish that the test complied with another specific requirement of WAC 448-13-035 concerning the standards for certification of thermometers used in breath test simulators. *Clark-Munoz*, 152 Wn.2d at 48. On the other hand, in *Reier*, this court held that because the State showed testing included a duplicate analysis as required by WAC 448-14-020, the blood alcohol test result was admissible. *Reier*, 127 Wn. App. at 756.

¶30 In *Straka*, the Supreme Court considered whether, in lieu of written protocols, the state toxicologist had to

[9] There is also no dispute Kim's blood alcohol test was performed by a WSTL analyst with a valid permit.

promulgate regulations for evaluating and certifying DataMaster machines and for preparing and testing a simulator solution. The court held that the written protocols were not "rules" within the meaning of the Administrative Procedure Act, chapter 34.05 RCW, and the toxicologist had to promulgate WAC regulations. The court stated that if the State showed a breath test was administered in compliance with the requirements contained in the WAC, the test result was admissible. However, the court noted that a defendant could still challenge the accuracy and reliability of the test by presenting evidence that the laboratory did not comply with its internal written protocols or procedures. *Straka*, 116 Wn.2d at 875. The court pointed out that while not governed by WAC regulations, the protocols nonetheless were discoverable and "resolution of the issue of the reliability and accuracy of the test results is for the trier of fact." *Id.*

¶31 In sum, the trial court did not abuse its discretion in denying Kim's motion to suppress. To admit Kim's blood alcohol test results, the State had to prove that the test was performed in compliance with the regulations contained in chapter 448-14 WAC. We conclude, and Kim does not dispute, that the State met its burden of establishing that the blood alcohol test met the requirements in chapter 448-14 WAC. There is no additional requirement to prove compliance with the Head Space GC Protocol for purposes of admissibility.[10]

### 3. *Exclusion of Evidence*

¶32 Kim contends the trial court abused its discretion in excluding evidence about her relationship with Lee and that Lee might have given her a "date-rape drug" the night of the accident.

¶33 In Kim's offer of proof, she argued Lee was upset that she was ending their relationship and he had engaged

---

[10] And as noted, Kim could challenge the accuracy and reliability of the blood alcohol test at trial by presenting evidence that the WSTL did not comply with the Head Space GC Protocol.

in controlling and harassing behavior in the past. According to Kim, when she tried to end their relationship a month before, Lee told her, "[i]f I cannot have you, no one else can. We will die together." On the evening of the accident, she and Lee went to a restaurant for dinner and shared a bottle of wine. At the end of the meal, when she returned to the table from the restroom and had a few more sips of wine, Kim said she felt different and dizzy. Kim wanted to present the testimony of the independent expert toxicologist who tested her blood to explain the fact that her blood did not test positive for a date-rape drug was not conclusive because date-rape drugs have a short half-life.

¶34 The trial court ruled that Kim could present evidence about the nature of her relationship with Lee and what happened the night of the accident but evidence about Lee's past behavior was not relevant. The trial court excluded evidence and argument about date-rape drugs because there was no evidence that Kim was given a date-rape drug and the testimony was speculative.

¶35 A defendant in a criminal case has a constitutional right to present a defense "consisting of relevant evidence that is not otherwise inadmissible." *State v. Rehak*, 67 Wn. App. 157, 162, 834 P.2d 651 (1992); *State v. Thomas*, 150 Wn.2d 821, 857, 83 P.3d 970 (2004). But " 'a criminal defendant has no constitutional right to have irrelevant evidence admitted in his or her defense.' " *Thomas*, 150 Wn.2d at 857 (quoting *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983)). Evidence is relevant if it has any tendency to make any fact that is of consequence to the case more or less likely than without the evidence. ER 401; *Thomas*, 150 Wn.2d at 858. Expert testimony or opinion that lacks a proper foundation or is not helpful to the trier of fact is not admissible. ER 702, 703; *State v. Read*, 147 Wn.2d 238, 249, 53 P.3d 26 (2002). The trial court has broad discretion regarding the admission or exclusion of evidence, and the trial court's decision will not be reversed absent a manifest abuse of discretion. *State v. Swan*, 114 Wn.2d 613, 658, 790 P.2d 610 (1990). A court abuses its discretion if its

decision is based on untenable or manifestly unreasonable grounds. *State v. Martinez-Lazo*, 10 Wn. App. 869, 872, 999 P.2d 1275 (2000).

■■ ■■ ¶36 Kim wanted to argue that Lee gave her a date-rape drug to show there was a superseding cause for the head-on collision. A defendant's conduct is not a proximate cause of the harm if, although it otherwise might have been a proximate cause, a superseding cause intervenes. A superseding cause is "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." RESTATEMENT (SECOND) OF TORTS § 440 (1965); *Campbell v. ITE Imperial Corp.*, 107 Wn.2d 807, 812, 733 P.2d 969 (1987). "An intervening force is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed." RESTATEMENT (SECOND) OF TORTS § 441(1) (1965); *State v. Souther*, 100 Wn. App. 701, 710, 998 P.2d 350 (2000); *State v. Roggenkamp*, 115 Wn. App. 927, 945, 64 P.3d 92 (2003). A superseding cause may relieve the actor from liability, irrespective of whether his prior negligence was or was not a proximate cause in bringing about the harm. RESTATEMENT (SECOND) OF TORTS § 440 cmt. b (1965); *Campbell*, 107 Wn.2d at 812.

¶37 But Kim presented no forensic or other evidence that Lee gave her a date-rape drug, and the evidence she relied on was speculative. There was no evidence that Lee caused Kim to ingest any drugs or that he in any other way caused her to drive in the wrong direction on Highway 99. There was also no evidence that Lee purchased or possessed a date-rape drug or ever intended to give Kim one. Nor were there any witnesses who saw Lee put anything in Kim's drink. And, notwithstanding Kim's argument about the relatively short half-life of date-rape drugs, the toxicology test performed at Harborview within two hours of the collision revealed no evidence of drugs in her blood.

¶38 *State v. Meekins*, 125 Wn. App. 390, 397-98, 105 P.3d 420 (2005), is factually distinguishable. In *Meekins*, the

Court of Appeals reversed the defendant's conviction for vehicular homicide because the trial court excluded evidence about whether the motorcycle driver had his headlights on and whether the lack of lights was the cause of the victim's accident. In addition to the testimony of the defendant, several witnesses to the accident testified that they did not see the motorcycle's headlights prior to the collision. There was also testimony that the motorcycle driver had driven without headlights before.

¶39 Here, because there was no evidentiary basis to support Kim's argument that Lee gave Kim a date-rape drug or otherwise caused her to drive the wrong way, the trial court did not abuse its discretion in excluding evidence about Lee's past behavior and about the possibility that Lee may have given Kim a date-rape drug.[11]

## CONCLUSION

¶40 We conclude the trial court did not err in denying Kim's motion to suppress the results of her blood alcohol test and did not abuse its discretion in excluding evidence about a date-rape drug. We affirm Kim's convictions for vehicular homicide and vehicular assault.

APPELWICK, C.J., and BECKER, J., concur.

Review denied at 159 Wn.2d 1022 (2007).

---

[11] Kim also claims the court erred by failing to inquire about misconduct that occurred in front of the jury during voir dire. Kim argues that the court's decision to not question the jury panel was erroneous and requires reversal of her conviction. But shortly after voir dire, Kim stipulated to a bench trial. Based on Kim's stipulation, her argument is moot.

Kim also challenges the trial court's ruling that her admission to Officer Huber that she knew she was driving in the wrong direction was admissible for impeachment. The alleged error was not preserved for appeal. Nevertheless, Kim admitted below that even if a *Miranda* violation occurred, the statement was admissible for impeachment purposes.