IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 78599-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHARLES EDWIN PILLON, | ) | |
| | ) | |
| Appellant. | ) | FILED: January 27, 2020 |

SCHINDLER, J.P.T.* — The trial court found Charles Edwin Pillon guilty of violation of the Hazardous Waste Management Act, RCW 70.105, count 1; wrecking vehicles without a license and with a prior conviction in violation of RCW 46.80.020, count 2; and unlawful dumping of solid waste without a permit in violation of RCW 70.95.030 and .240, count 3. Pillon seeks reversal of count 1 and count 2. Pillon contends (1) sufficient evidence does not support finding the State proved the elements of violation of the Hazardous Waste Management Act and wrecking vehicles without a license beyond a reasonable doubt, (2) the court abused its discretion and violated his right to present a defense by excluding witness testimony, (3) the judge violated his due process right to a fair trial by asking questions, and (4) cumulative error deprived him of the right to a fair trial. We affirm.

FACTS[1]

In 1977, Charles Edwin Pillon purchased a 10-acre parcel of property on Renton Issaquah Road Southeast in unincorporated King County. Pillon has lived on the property since 1979.

Pillon used "a large portion of the property to store, collect, accumulate, and dispose of various items of solid waste." Pillon allowed members of the public to leave solid waste and vehicles on his property in exchange for a "tipping fee." Between February 25, 2015 and February 25, 2016, Pillon " 'put the word out' " to the community "that people could dump solid waste" on his property. Pillon would also "collect solid waste to bring back to his property." Pillon admitted to "receiving onto his property approximately 120 cubic yards of solid waste per month." In exchange for assisting Pillon in collecting the tipping fees and working on his property, Pillon allowed "individuals to live in the used motor homes and recreational vehicles." The individuals would move "items of solid waste into the areas of the property where" that type of item was "stored and/or disposed," collect "recyclable materials," and remove "metals from the vehicles and solid waste brought onto the property" to be "sold as scrap." The parts and materials removed from the vehicles, boats, and boat trailers were "sorted and placed into a collection 'tub' " and sold as scrap.

---

[1] Pillon does not challenge the extensive findings of fact.

2

On March 27, 2015, Washington State Patrol (WSP) aircraft videotaped the condition of the property. A screenshot from the videotape shows solid waste "stored and/or disposed" in three different areas on the property: a bus and recreational vehicle (RV) area, a workshop area, and a landfill area:



Pillon did not have a permit or license to store or dispose of solid waste or hazardous waste. Storm water and groundwater from Pillon's property drains into nearby May Creek and "ultimately, to Lake Washington."

On December 3, 2015, Seattle and King County Public Health (SKCPH) issued a notice of violation to Pillon for the collection and disposal operation. On January 11, 2016, WSP aircraft took another video of the property.

WSP obtained a warrant to search the Pillon property on February 25, 2016. WSP Trooper Troy Giddings executed the warrant to search the property. Washington State Department of Ecology (WDOE) and United States Environmental Protection

Agency (USEPA) employees took photographs and obtained random samples for testing from the soil and the containers located in the "Bus/RV" area, the workshop area, and the landfill area.

There were "[a]pproximately 2,000 containers" located on Pillon's property and it was "impossible to determine how many containers could be buried under solid waste piles." The agency employees selected nine containers from the three different areas "in an effort to randomize the sample as much as possible to provide a fair representation of the types, location, and condition of the various containers" on the property.

Laboratory tests identified high levels of arsenic, cadmium, and chromium in the soil samples and characteristics of ignitability in the container samples from the Bus/RV area. Soil and container samples from the workshop area contained high levels of lead, arsenic, cadmium, and chromium. Soil samples from the landfill area contained high levels of arsenic and chromium.

The Washington State Office of the Attorney General and the King County Office of the Prosecuting Attorney (collectively, the State) filed charges against Pillon. The State alleged that between December 15, 2015 and February 25, 2016, Pillon violated the Hazardous Waste Management Act, chapter 70.105 RCW, and chapter 173-303 WAC, count 1; engaged in wrecking vehicles without a license and with a prior conviction in violation of RCW 46.80.020, count 2;[2] and unlawfully dumped solid waste

---

[2] In 2007, Pillon pleaded guilty to wrecking motor vehicles on the property without a license in violation of RCW 46.80.020.

without a permit in violation of RCW 70.95.030 and .240, count 3.

## COUNT I
### VIOLATION OF HAZARDOUS WASTE MANAGEMENT ACT

On or between December 15, 2015, and February 25, 2016, in the State of Washington, the above-named Defendant did knowingly transport, store, handle, or dispose of a hazardous substance, to wit: solid waste exhibiting characteristics of ignitability, corrosivity, reactivity, and/or toxicity as stated in WAC 173-303-090, in violation of Ch. 70.105 RCW, to wit: implementing regulations WAC 173-303-140 and WAC 173-303-800(2), and did so in a manner which the Defendant knew placed the natural resources owned by the state of Washington in imminent danger of harm; contrary to RCW 70.105.085(1)(b) and 70.105.010. (Class C felony with a maximum penalty of five (5) years imprisonment and/or a $10,000 fine, pursuant to RCW 9A.20.021(1)(c), plus restitution, assessments and court costs.)

## COUNT II
### WRECKING VEHICLES WITHOUT A LICENSE WITH PREVIOUS CONVICTION

On or between December 15, 2015, and February 25, 2016, in the State of Washington, King County, the above-named Defendant, did engage in the business or wrecking vehicles without having first applied for and received a license, and the Defendant was previously convicted of violating RCW 46.80.020 in State of Washington v. Charles Edwin Pillon, King County Superior Court Cause Number 06-1-12433-9 KNT; contrary to Revised Code of Washington 46.80.020. (Class C felony with a maximum penalty of five (5) years imprisonment and/or $10,000 fine, or both pursuant to RCW 46.80.020(2)(b) and RCW 9A.20.021(1)(c), plus restitution, assessments and court costs.)

## COUNT III
### UNLAWFUL DUMPING OF SOLID WASTE WITHOUT A PERMIT

On or between February 25, 2015, and February 25, 2016, in the State of Washington, King County, the above-named Defendant, did dump or deposit solid waste onto or under the surface of the ground, in an amount of one cubic yard or more; contrary to RCW 70.95.030, and RCW 70.95.240, and against the peace and dignity of the State of Washington. (Gross misdemeanor with a maximum penalty of three hundred sixty-four (364) days jail and/or a $5,000 fine pursuant to RCW 9A.20.021(2) and RCW 70.95.240(3)(c), plus restitution and assessments.)

Pillon entered a plea of not guilty and filed a motion to waive his right to counsel and proceed pro se. Following a hearing, the court concluded Pillon "knowingly, intelligently and voluntarily" waived his right to counsel. The court found Pillon

"understands the charges and consequences of his waiver," he "is competent," and he was "entitled to exercise his constitutional right to represent himself."

The court scheduled the trial to begin on April 2, 2018. Pillon waived his right to a jury trial. Before trial, Pillon and the attorney representing the State entered into "Stipulations of the Parties Regarding Agreed Facts, Testimony, and Evidence." The parties stipulated that a number of facts were "true and may be considered by the court as undisputed evidence in this case." The parties stipulated to the admissibility of evidence, including an October 2014 SKCPH "Environmental Health Assessment" of the Pillon property, the WSP aerial videos and photographs of the property, receipts seized from Pillon's residence during execution of the search warrant that showed money received for scrap metal, and a certified copy of the previous 2007 conviction for wrecking motor vehicles without a license. Pillon agreed to waive foundation objections to the testimony of State witnesses, including testimony about results from the testing of the soil and container samples obtained from his property.

The parties entered into a "Contingent Stipulation":

> The purposes of this stipulation is to avoid the necessity of the below named witness having to testify if the court finds the information relevant and admissible. If the court rules that the testimony/witnesses below are relevant and admissible, the parties agree and stipulate that the court can consider the below summaries as substantive evidence in lieu of having the witness(es) testify. Mr. Pillon fully understands the contingent nature of this stipulation, including that the State will be moving to exclude the testimony of these witnesses.[3]

The Contingent Stipulation notes the evidentiary objections of the State to potential defense witness testimony:

> The State takes the position that the potential testimony summarized below is irrelevant and its admission should be precluded by,

---

[3] Emphasis in original.

inter alia, Rules of Evidence (ER) 401, 402, 403, 602, and 701. Mr. Pillon takes the position that this testimony is relevant and should be admitted under the same evidence rules. The parties agree that this issue shall be litigated before the assigned trial court.

The Contingent Stipulation includes a summary of the testimony of "potential defense witnesses," including Pillon's friends and neighbors, King County River and Floodplain Management Section Manager Steve Bleifuhs, and WSP Trooper Rene Padgett. The Contingent Stipulation attaches the declarations of friends and neighbors Douglas Bandelin, Clint Cave, Raymond Cox, Amy McGann, Ken Osborne, Mike Pruitt, and Jarod Wood; a declaration of former Renton Mayor Dennis Law; and the decision of King County Hearing Examiner Stafford Smith in the 2002 code enforcement action against Pillon.

The State filed a trial brief and provided instructions on the law, including instructions on the elements for the charged crimes. At the beginning of the trial, the State objected to the testimony that Pillon was trying to "keep [the] community safe" as inadmissible and irrelevant character evidence. The court ruled the testimony of the potential defense witnesses "attesting" to Pillon's good character and their opinions about his motivation to protect the community were not relevant to the charged crimes. Pillon conceded the testimony of King County River and Floodplain Management Section Manager Bleifuhs "is more in the realm of character" evidence.

The summary of the testimony of Trooper Padgett describes interactions with Pillon in 2002 and 2006 during the execution of warrants to search his property. The State objected to the proposed testimony of Trooper Padgett as improper character evidence, outside the charging period, and not relevant or related to the charged

7

crimes. The court ruled the testimony of Trooper Padgett was unrelated to the charges and did not meet the requirements for admission as character evidence.

The State called a number of witnesses to testify at trial, including Trooper Giddings, King County Code Enforcement Section Manager Sheryl Lux,[4] SKCPH Inspector Leonard Di Toro, WDOE storm water expert Ben Billick, and USEPA expert and emergency management and response coordinator Jeffrey Fowlow. The court admitted into evidence several hundred photographs of the property, including photographs of the landfill area, the workshop area, and the Bus/RV area:



---

[4] The Code Enforcement Section is part of the King County Department of Permitting and Environmental Review.

Trooper Giddings is a WSP Towing and Wrecking Division Inspector. Trooper Giddings testified that when he executed the search warrant, there were more than 50 vehicles and RVs and more than 400 tires on the property. Most of the vehicles were "either partially dismantled or somehow crushed, altered, [or] bent" with "loose parts . . . spread across the property," including engines and radiators. Trooper Giddings testified that during the search of Pillon's residence, he seized 2015 and 2016 sales receipts from Binford Metals and Auto Wrecking for scrap metal. Trooper Giddings described how to strip or cut metals from RVs:

> Stripping or cutting up would mean the dismantling or separation of the metals from the — in the case of like a recreational vehicle, a[n] RV, a large portion of the walls are wood and other — insulation and other objects and they have a — some of the older ones have a tin outer shell. So the outer shell, which is either a tin or aluminum, could be recycled for — for the metal purposes, as well as the frames.

Trooper Giddings testified that he informed Pillon of his Miranda[5] rights and Pillon waived his right to remain silent. Pillon admitted that he allowed "stripping and cutting up of recreational vehicles and separating the metals to be sold as scrap." Pillon told Trooper Giddings that when the containers on his property were full of scrap metal, he would sell the metal to Binford Metals and Auto Wrecking.

King County Code Enforcement Section Manager Lux testified about the environmental damage and health hazards created by the property and contaminants seeping into the groundwater. Lux testified that water from the Pillon property would enter salmon-bearing May Creek. Lux first discussed these concerns and code violations with Pillon during an inspection in 2000. Lux sent a letter to Pillon identifying the code violation and "what needed to be done to fix it." When Pillon did not comply,

---

[5] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Lux issued a notice of violation. Lux testified that by 2003, there was "some progress of cleanup" but "there seemed to be more vehicles" on the property.

Lux testified that she inspected Pillon's property one more time "after 2003." Lux said that during "the final inspection," there was "again, some progress. . . . I know he had made some progress in cleaning up materials, getting rid of some cars." Lux said the vehicles on the property appeared to be in a "state of disrepair and/or . . . being actively disassembled."

In response to complaints from neighbors, SKCPH Inspector Di Toro inspected the property in 2012. Di Toro "observed piles of glass, crushed glass, piles of construction and demolition waste . . . , abandoned or inoperable vehicles, steel, [and] plastic, just a real cornucopia of materials." Di Toro testified:

> In this particular case, when you have a landfill that's not permitted or designed, you have — there's a potential for, excuse me, leechate[6] to percolate through the — the material and get into ground and surface water.
> . . . [T]his particular property, the materials are deposited on the surface of the ground. If it was a permitted landfill, there would be a liner, there would be a leechate collection system which would take the leechate away from the landfill, treat it and eventually discharge it to public sewer.
> And there would also be a gas collection system because landfills or areas where piles of putricible[7] material are stored tend to produce gas. In this case it would be methane, [carbon dioxide], primarily. Methane, as you know, is explosive and flammable. And that [can] also be extracted from the landfill and burned off or run through a carbon filter and then in some cases used for fuel if it's cleaned up. So there are certain requirements in order to landfill material that have to be met and obviously this particular property is not meeting that.

---

[6] Di Toro described "leechate" as the material formed by "precipitation [that] passes through the solid waste materials" and "picks up solids and other pollutants," and "that material would — could eventually get into ground and surface water and cause pollution to the water, which would affect fish and potentially other users, recreational users of the water body."

[7] The instructions defined "putrescible" as "subject to decay."

Di Toro testified he periodically went to the Pillon property "[o]ver the next several years" to confirm whether the conditions he observed in 2012 "still existed." Di Toro served Pillon with a notice of violation in 2015 for operating a landfill without a permit in violation of the King County Code, WDOE regulations, and Washington Administrative Codes. Di Toro said the notice of violation identified the steps Pillon needed to take to comply with the codes and regulations. In December 2015, Di Toro issued a second notice of violation.

Di Toro testified that during an inspection of the property in February 2016, there were areas on the property where he saw solid waste—including construction and demolition material, mattresses, furniture, wire, and plastics—in piles that were "20- to 30-feet tall" and "several hundred yards" long.

> Q. Now, you said there was a 20 to 30 percent — 20-to-30-foot elevation difference. Do you believe that the piles of the solid waste were 20- to 30-feet tall?
> A. Correct. From the ground level, the existing grade which I was able to establish from the adjacent property, I'm estimating that the piles were 20- to 30-feet tall. Hence we're calling it an above ground landfill.
> Q. And how big were these piles then — if they're that tall, how long or — or how far do they run?
> A. Oh, they were several hundred yards.

Di Toro described a school bus that contained "a large number of five-gallon buckets of paint":

> [T]hat material was stored in a school bus for appeared a prolonged period of time. The buckets were not such a good shape. I can't say they were leaking but they were corroded.

Di Toro testified there were other "containers and drums with unknown material that appeared to be leaking or near leaking" that would impact "ground and surface water."

11

WDOE storm water expert Billick works with "local jurisdictions on implementing storm water management plans to control pollution associated with storm water runoff." Billick identified many areas of spillage on the property, including the spilled contents from a broken five-gallon bucket and an area with "white, semitranslucent liquid substance that had either spilled or leaked on to the ground." Billick testified about the test results for samples taken from the soil and containers on the property. Billick said the samples contained arsenic, copper, iron, manganese, and zinc. Billick testified that the "chronic and acute" exposure to metals found in the samples exceeded both surface water and groundwater quality standards. Billick testified the water quality samples were "unsafe for aquatic life" and he "would expect" to find "much higher concentrations for certain contaminants" if the samples had been taken after it rained. Billick testified contaminated storm water runoff from the property flows into a ditch that runs along Renton Issaquah Road Southeast, then into nearby May Creek, and ultimately into Lake Washington.

USEPA emergency management and response coordinator Fowlow is an expert in evaluating imminent and substantial threats to human health and the environment.

Fowlow evaluated the Pillon property during the execution of the search warrant on February 25, 2016. Fowlow testified the stained soil on the property is a result of spilled containers. Fowlow said there were "a dozen or two dozen five-gallon buckets" in the Bus/RV area "that had formerly contained some kind of a chemical." Fowlow said the chemicals had spilled and accumulated around the buckets and there was "some oily product on the top of the lids." Fowlow testified there were "several areas" where the vehicles "were stacked" with drums and containers "four, five high." Fowlow

12

described a flatbed truck down an embankment in a ravine with "one to two dozen 55-gallon drums" that were "completely swamped over by the blackberry bramble." Fowlow was also concerned about the number of containers buried under "20-foot deep piles of solid waste":

> The containers that we were able to see on the [surface] or in the vehicles would number hundreds. Our concern would be that the — the 20-foot deep piles of solid waste there also have containers. . . . [E]specially since from the surface you could actually see some of them in those piles that were crushed.

Fowlow used photographs to describe the hazards created by the rusted and decrepit containers:

> Q. . . . [Photograph] 1086, what are we looking at here?
> A. That's a plastic chemical container, probably a gasoline container. It's crushed and broken and, you know, half buried in the — the mucky, woody soil. . . .
>
> . . . .
> Q. [Photograph] 1088. What are we looking at here?
> A. Those are 55-gallon poly drums. There's a couple of them, at least that I can see. They're crushed, they're broken, the contents have been released. There may be some residual contents because it appears that there is some liquid in the bottom end of the drum in the foreground. You see, also, stained soil in the area.
>
> . . . .
> And there was a lot of — of surface material that had that kind of staining, and you could see that [in] the vegetation in areas beat down and dead. We would — we would assess that and have a fairly high level of confidence that there was some kind of chemical contamination there, which is probably associated with those broken drums.
> Q. . . . .
> And [photograph] 1108?
> A. It's a debris pile with a lot of wood and drywall debris and other plastic debris. I see five gallon containers. There's a propane cylinder there.
> The — the containers are not managed, they're — they're tipped over on their side. I don't know if there's anything in them but — but there is obviously no care taken to — to keep those separate from more innocuous waste.
> Q. [Photograph] 1139?

13

A. That's a view of the surface with broken and rusted and — and destroyed five-gallon containers, and it also looks like there's a one-gallon container on the right hand side. Additionally there's just — looks like roofing material, cardboard and stained soil.

. . . .

Q. What do we have in [photograph] 1177?
A. That is a large debris pile in the foreground and I think that's a residence in the background. The debris pile has, you know, plastic tarps and wood and tires, automotive parts it seems like. Also a lot of, you know, woody debris.

I don't know if I see any sort of chemical containers in it, but that's a good example of probably something that's 10 or 15 feet deep.

. . . .

Q. And [photograph] 1378?
A. In the foreground is a debris pile with various amounts of household and industrial trash as well as chemical containers in five-gallon buckets and looks like 20-gallon buckets.

Fowlow testified that in evaluating hazardous and dangerous waste, there are "four main criteria we're looking at, toxicity, ignitability, corrosivity and reactivity." Fowlow testified that a sample from a container in the Bus/RV area was "hazardous based on ignitability." A container sample from the workshop area was both flammable and tested positive for lead at a level that showed it was "hazardous waste based on toxicity." Fowlow testified the "standard for lead" is 5 milligrams per liter and the sample from a container "was 106 milligrams per liter."

On cross-examination, Fowlow testified that several of the container and soil samples constituted "an imminent and substantial threat." On redirect examination, Fowlow testified that he had "no doubt" that the property was an imminent and substantial risk to the environment of Washington State.

Pillon testified. Pillon said he believed he was "performing a public service" by removing debris from public roads and allowing members of the community to bring vehicles and solid waste to his property. Pillon testified he knew he needed a permit to

operate a wrecking yard on his property but decided to "make a hard choice" and defy "regulatory authority" so he could do "the right thing here on these streets for my community."

On cross-examination, Pillon conceded that when WSP executed the warrant to search his property in 2006, he told a news reporter that he "knew" what he was "doing on the property violated King County Code" and "probably violated State law." Pillon told the reporter he knew it was a "possibility that the State could fine" him for the condition of his property. Pillon admitted he said a "fine wasn't going to stop" him. At the conclusion of the trial, Pillon stipulated he did not have a permit or license to store or dispose hazardous waste.[8]

The trial court found Pillon guilty as charged of violation of the Hazardous Waste Management Act, count 1; wrecking vehicles without a license and with a prior conviction, count 2; and unlawful dumping of solid waste without a permit, count 3. The court entered extensive findings of fact and conclusions of law and incorporated by reference the oral findings of fact and the stipulations. The unchallenged findings state, in pertinent part:

> 2. The parties negotiated, agreed upon and submitted a number of stipulations. These stipulations were filed with the Court as Stipulation of the Parties Regarding Agreed Facts, Testimony and Evidence and Additional Stipulations of the Parties Regarding Agreed Facts.
>
> 3. The Court relied heavily upon both sets of stipulations and specifically incorporates each by reference, including but not limited to, the

---

[8] The stipulation states:

Neither Charles Pillon nor anyone associated with his property had a valid permit or license issued by the Washington State Department of Ecology or any other authorizing local, state or federal agency allowing for the storage or disposal of hazardous or dangerous waste.

various pictures and videos admitted via those stipulations. The Court finds as fact each fact stipulated to in both sets of stipulations.

The court found the "State's witnesses credible and their testimony believable."

The unchallenged findings state Pillon owns the property and did not have the required permits to store or dispose hazardous, dangerous, or solid waste:

7. At all times relevant to this case, the defendant owned the property that is the subject of these charges — 15753 S.E. Renton-Issaquah Road, Renton, Washington.

8. The defendant maintained control over the subject property and exercised managerial authority over all activity relevant to these charges taking place upon the property.

9. The defendant did not have any of the required permits or licenses allowing for the storage or disposal of hazardous or dangerous waste on the property.

10. The defendant did not have any of the required permits or licenses allowing for the storage or disposal of solid waste on the property.

The findings describe the hazards on the property and the imminent and substantial risk to the environment:

12. Storm[ ]water and groundwater running off the defendant's property drain to May Creek and, ultimately, to Lake Washington.

13. May Creek and Lake Washington are waters of the State of Washington and a natural resource of the State of Washington.

14. The defendant either brought or allowed to be brought onto the property numerous containers with unknown substances inside them.

15. This activity continued to occur during the charging timeframe for Count I — December 15, 2015 thru February 25, 2016.

16. Approximately 2,000 containers were on the surface of the defendant's property. It is impossible to determine how many containers could be buried under solid waste piles on the defendant's property.

. . . .

16

19. Of these nine sampled containers, three were found to contain hazardous substances — two exhibited characteristics of ignitability and one exhibited characteristics of toxicity qualifying them as hazardous and dangerous waste under Washington Law.

20. Containers throughout the defendant's property were exposed to the elements and exhibited great signs of wear and rusting.

21. These containers could fail and release their contents into the storm[ ]water and/or groundwater and thus into the waters of the State of Washington.

22. Numerous containers on the property had either been damaged or failed, resulting in release of whatever contents had been in the container onto the ground.

23. The defendant demonstrated great knowledge of the flow of water onto and off of his land and clearly understood that water flowing off his land went into May Creek and the waters of the State of Washington.

The court found Pillon guilty of violation of the Hazardous Waste Management

Act, count 1:

The following elements of the charged crime of Violation of the Hazardous Waste Management Act have been proven by the State beyond a reasonable doubt:  .

   a.  Between December 15, 2015 and February 25, 2016, the defendant knowingly stored or disposed of hazardous substances [that] exhibited characteristics of ignitability and/or toxicity;

   b.  Such storage or disposal violated state law and Department of Ecology regulations;

   c.  Such storage or disposal was done in a manner that the defendant knew placed natural resources owned by the State of Washington in imminent danger of harm; and

   d.  That one or more of these acts occurred in King County, Washington.

The court found Pillon guilty as charged for count 2:

The following elements of the charged crime of Wrecking Vehicles Without a License With a Prior Conviction have been proven by the State beyond a reasonable doubt:

    a. Between December 15, 2015 and February 25, 2016, the defendant engaged in the business of wrecking vehicles;

    b. The defendant had not first applied for and received a vehicle wrecker's license from the Department of Licensing;

    c. A[t] the time the defendant engaged in the business of wrecking vehicles he had previously been convicted of Wrecking Vehicles Without a License in violation of RCW 46.80.020; and

    d. One or more of these acts occurred in King County, Washington.

The court found Pillon guilty as charged for count 3:

The following elements of the charge of Unlawful Dumping of Solid Waste Without a Permit have been proven by the State beyond a reasonable doubt:

    a. Between February 25, 2015 and February 25, 2016, the defendant knowingly dumped or deposited, and permitted the dumping and depositing of, solid waste in a quantity of one cubic yard or more onto or under the soil;

    b. This dumping or depositing violated relevant statutes; and

    c. These acts occurred in King County, Washington.

The court imposed a concurrent 30-day sentence on count 1 and count 2, a $10,000 fine, restitution, and "Additional Conditions of Sentence" prohibiting Pillon from accepting or removing any solid waste from his property and ordering him to "cooperate fully with any and all clean-up efforts." The court imposed a suspended sentence of 364 days on the gross misdemeanor, count 3, to run consecutively to count 1 and count 2, 24 months of probation, a $5,000 fine, and restitution.

18

ANALYSIS

<u>Sufficiency of the Evidence</u>

Pillon contends insufficient evidence supports finding him guilty of violation of the Hazardous Waste Management Act and wrecking vehicles without a license.[9]

Sufficiency of the evidence is a question of constitutional law that we review de novo. <u>State v. Rich</u>, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); <u>Rich</u>, 184 Wn.2d at 903. The State has the burden to prove every element of the crime charged beyond a reasonable doubt. U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3; <u>Winship</u>, 397 U.S. at 364.

Review of a challenge to the sufficiency of the evidence is "highly deferential" to the fact finder's decision. <u>State v. Davis</u>, 182 Wn.2d 222, 227, 340 P.3d 820 (2014). In addressing a claim of insufficient evidence, we consider " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " <u>State v. Johnson</u>, 188 Wn.2d 742, 762, 399 P.3d 507 (2017)[10] (quoting <u>State v. Green</u>, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)).

Evidence is sufficient if after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime

---

[9] Pillon does not appeal the conviction for unlawful dumping of solid waste without a permit, count 3.

[10] Internal quotation marks omitted.

beyond a reasonable doubt. State v. Owens, 180 Wn.2d 90, 99, 323 P.3d 1030 (2014). A challenge to the sufficiency of the evidence admits the truth of the State's evidence. State v. Witherspoon, 180 Wn.2d 875, 883, 329 P.3d 888 (2014). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781(1979). In determining sufficiency, circumstantial evidence is no less reliable than direct evidence. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the trier of fact on "issues of witness credibility." Witherspoon, 180 Wn.2d at 883.

We review the trial court's findings to determine whether substantial evidence supports the challenged findings and in turn, whether the supported findings and unchallenged findings support the court's conclusions of law. State v. Klein, 156 Wn.2d 102, 115, 124 P.3d 644 (2005); State v. Coleman, 6 Wn. App. 2d 507, 516, 431 P.3d 514 (2018), review denied, 193 Wn.2d 1005, 438 P.3d 122 (2019). Unchallenged findings are verities on appeal. Coleman, 6 Wn. App. 2d at 516.

Count 1: Violation of the Hazardous Waste Management Act

Pillon argues the State did not prove beyond a reasonable doubt that he knowingly engaged in conduct that resulted in an imminent danger of harm to Washington's natural resources by storing or placing hazardous substances on his property.

RCW 70.105.085 defines violation of the Hazardous Waste Management Act, in pertinent part, as follows:

(1) Any person who knowingly transports, treats, stores, handles, disposes of, or exports a hazardous substance in violation of this chapter is guilty of

20

. . . (b) a class C felony punishable according to chapter 9A.20 RCW if the person knows that the conduct constituting the violation places any property of another person or any natural resources owned by the state of Washington or any of its local governments in imminent danger of harm.

(2) As used in this section: (a) "Imminent danger" means that there is a substantial likelihood that harm will be experienced within a reasonable period of time should the danger not be eliminated; and (b) "knowingly" refers to an awareness of facts, not awareness of law.

To convict Pillon of violation of the Hazardous Waste Management Act, the State had the burden of proving beyond a reasonable doubt that between December 15, 2015 and February 25, 2016, Pillon "knowingly stored or disposed of a hazardous substance"; that "such storage or disposal violated state law or Department of Ecology regulation"; and that "such storage or disposal was done in a manner" that Pillon "knew placed natural resources owned by the State of Washington in imminent danger of harm."

"Dispose" or "disposal" means "the discarding or abandoning of hazardous wastes or the treatment, decontamination, or recycling of such wastes once they have been discarded or abandoned." RCW 70.105.010(6). A "hazardous substance" is defined as "any liquid, solid, gas, or sludge, including any material, substance, product, commodity, or waste, regardless of quantity, that exhibits characteristics or criteria of hazardous waste as described in rules adopted under this chapter." RCW 70.105.010(10). "Hazardous waste" is defined as "all dangerous and extremely hazardous wastes, including substances composed of both radioactive and hazardous components." RCW 70.105.010(11). "Solid waste" or "wastes" means "all putrescible and nonputrescible solid and semisolid wastes including, but not limited to, garbage, rubbish, ashes, industrial wastes, swill, sewage sludge, demolition and construction

21

wastes, abandoned vehicles or parts thereof, and recyclable materials." RCW 70.95.030(22).[11]

WAC 173-303-090(4) defines "dangerous waste characteristics," in pertinent part, as follows:

> A solid waste is a dangerous waste if it exhibits one or more of the dangerous waste characteristics described in subsections (5), (6), (7), and (8) of this section. If a person's solid waste exhibits one or more of these characteristics, then he or she is a dangerous waste generator . . . .
> (5)  Characteristic of ignitability.
> . . . .
> (6)  Characteristic of corrosivity.
> . . . .
> (7)  Characteristic of reactivity.
> . . . .
> (8)  Toxicity characteristic.

WAC 173-303-090(8)(c) states that "[a]ny waste that contains contaminants which occur at concentrations at or above the DW[12] threshold must be designated DW." "Toxicity characteristics" include arsenic, cadmium, chromium, and lead. WAC 173-303-090(8)(c).

The court found Pillon knowingly stored or disposed of hazardous substances that placed the natural resources of the state in imminent danger of harm. The written findings state, in pertinent part:

> 24. The defendant knew that he was storing various hazardous and dangerous wastes on his property.
>
> 25. Given the condition of the defendant's property, including the numerous containers and the decrepit condition of those containers, any reasonable person would know that their storage posed an

---

[11] 40 C.F.R. § 261.2(a) defines "solid waste" as "any discarded material" that is "[a]bandoned," "[r]ecycled," or "[c]onsidered inherently waste-like." 40 C.F.R. § 261.3 states a "solid waste . . . is a hazardous waste" if it "exhibits one or more characteristics of" ignitability, corrosivity, reactivity, or toxicity.

[12] Dangerous waste.

imminent danger to the waters of the State of Washington. From this, the court concludes that the defendant had this knowledge.

Pillon does not challenge the written findings. Pillon cites State v. Shipp, 93 Wn.2d 510, 610 P.2d 1322 (1980), and the court's oral ruling to argue the court improperly used an objective presumption rather than a subjective knowledge standard to convict him of violation of the Hazardous Waste Management Act under RCW 70.105.085.

RCW 9A.08.010(1)(b) defines "knowledge" as follows:

A person knows or acts knowingly or with knowledge when:
(i) he or she is aware of a fact, facts, or circumstances or result described by a statute defining an offense; or
(ii) he or she has information which would lead a reasonable person in the same situation to believe that facts exist which facts are described by a statute defining an offense.

In Shipp, the Washington Supreme Court held the knowledge statute "merely allows the inference that a defendant has knowledge in situations where a reasonable person would have knowledge, rather than creating a mandatory presumption that the defendant has such knowledge." Shipp, 93 Wn.2d at 512. Although knowledge may not be presumed under RCW 9A.08.010(b)(ii), because a reasonable person would have knowledge under the circumstances, knowledge may be inferred and this inference is enough to establish actual subjective knowledge. State v. Womble, 93 Wn. App. 599, 604, 969 P.2d 1097 (1999); State v. Johnson, 119 Wn.2d 167, 174, 829 P.2d 1082 (1992).

In context, the court's oral ruling does not support Pillon's argument that the court improperly applied an objective mandatory presumption. In the oral ruling, the court

23

stated:

> It's not necessary that the person know that a fact, circumstance, or result as defined by law as being lawful or an element of the crime. And I also can draw on what a reasonable person in the same situation would consider to believe a fact exists.
>
> . . . .
>
> . . . The Court finds, based on the level of testimony, that there was overwhelming evidence that Mr. Pillon knew or should have known that he was storing hazardous substances.
>
> . . . .
>
> The third [prong of the to-convict instruction] was that such storage or disposal was done in a manner that the defendant knew placed natural resources owned by the State of Washington in imminent harm. . . . [T]he Court can draw inferences over what a reasonable person would know under the same circumstances.
>
> . . . A reasonable person would know that storage was done in a manner that would raise the danger of imminent harm.
>
> . . . .
>
> And I think it's important to note that I find that I — I think it's believable when Mr. Pillon says that he believes his actions are for the good of the public and in cleaning up the roadways and in inviting others to bring otherwise potentially illegally dumped garbage to his property, that he's doing the right thing.
>
> But just because that's what you believe, Mr. Pillon, it's not a defense to the charge or relieves you from the responsibility of obeying the law and complying with the necessary permits and regulations of the various agencies.

The court's finding that a reasonable person in the same circumstances would have known Pillon violated the Hazardous Waste Management Act is a permissible inference.

Pillon also contends insufficient evidence supports finding he knowingly placed the natural resources of the state in imminent harm. Because the unchallenged findings establish Pillon knew there was an imminent danger of harm to the natural resources of the state, we disagree.

Neither Pillon nor anyone living or working on his property had permits or a license to store or dispose hazardous waste. The containers on his property were

24

"exposed to the elements and exhibited great signs of wear and rusting," and "[n]umerous containers" were "damaged or failed, resulting in release of" the contents "onto the ground." The undisputed record establishes the USEPA testing of the samples taken from Pillon's property showed elevated levels of dangerous metals, contaminants, and hazardous waste. The findings establish Pillon knew "he was storing various hazardous and dangerous wastes on his property" in decrepit containers that posed an imminent danger to the natural resources of the state. The findings state Pillon "demonstrated great knowledge" about "the flow of water onto and off of his land" and "clearly understood that water flowing off his land went into May Creek and the waters of the State of Washington."

We conclude the court applied the correct knowledge standard and substantial evidence supports finding Pillon violated the Hazardous Waste Management Act.

<u>Count 2: Wrecking Vehicles Without a License and With a Prior Conviction</u>

Pillon contends insufficient evidence supports finding he engaged in the business of vehicle wrecking.

RCW 46.80.020 defines the crime of wrecking vehicles without a license, in pertinent part, as follows:

(1)(a) . . . [I]t is unlawful for a person to engage in the business of wrecking vehicles without having first applied for and received a license.
. . . .
(2)(a) . . . [A] person or firm engaged in the unlawful activity described in this section is guilty of a gross misdemeanor.
(b) A second or subsequent offense is a class C felony punishable according to chapter 9A.20 RCW.[13]

---

[13] We note the legislature amended RCW 48.80.020 in 2018 to add subsection (1)(b) to permit a compliant solid waste disposal site to "wreck a nonmotorized abandoned recreational vehicle." LAWS OF 2018, ch. 287, § 8. Because the amendment is not pertinent to our analysis, we quote the current statute.

Pillon contends there is no evidence that he engaged in the business of vehicle wrecking or received any benefit. We disagree.

The unchallenged findings establish that between December 15, 2015 and February 25, 2016, Pillon "engaged in the business of wrecking vehicles" without a license and that he had a prior 2007 conviction for wrecking vehicles without a license. The findings state that when Trooper Giddings executed the search warrant on February 25, 2016, "more than 50 vehicles were found on the defendant's property in various states of disassembly." From December 15, 2015 through February 25, 2016, Pillon "encouraged and allowed" people living on his property to "strip[ ] wiring and siding from recreational vehicles on the property." The uncontroverted evidence shows Pillon collected "tipping fees" ranging from "$20 for a pickup load to $100 for a dump truck load." The receipts seized from the residence showed "the scrap parts and metals were sold to recyclers." Pillon admitted to "engaging in scrapping activities, selling parts, and cutting up trailers for scrap" and had people living on his property do the same "work" with his knowledge, permission, and encouragement. The unchallenged findings state, in pertinent part:

33. A large recycling bin was on the property prior to the execution of the search warrant on February 25, 2016. The bin had been removed by the time the warrant was executed.

34. The defendant admitted that, during the charging period for Count II, he personally cut up boat trailers and recreational vehicles and put the recyclable parts into the bin and encouraged others to engage in this activity.

35. Receipts were found during the search warrant demonstrating that the scrap parts and metals were sold to recyclers during the charging period for Count II.

36. The defendant admitted post-<u>Miranda</u> to engaging in scrapping activities, selling parts, and cutting up trailers for scrap.

Substantial evidence supports finding Pillon engaged in the business of wrecking vehicles without a license and with a prior conviction.

<u>Exclusion of Character Evidence</u>

Pillon contends the trial court abused its discretion and violated his right to present a defense by excluding the testimony of defense witnesses in the Contingent Stipulation.

We review evidentiary rulings for abuse of discretion. <u>State v. Garcia</u>, 179 Wn.2d 828, 846, 318 P.3d 266 (2014). The trial court has broad discretion regarding the admission or exclusion of evidence, and we will not reverse a trial court's decision absent a manifest abuse of discretion. <u>State v. Mee Hui Kim</u>, 134 Wn. App. 27, 41, 139 P.3d 354 (2006).

We review an alleged denial of the constitutional right to present a defense de novo. <u>State v. Jones</u>, 168 Wn.2d 713, 719, 230 P.3d 576 (2010). Whether rooted in the compulsory process clause of the Sixth Amendment or the due process clause of the Fourteenth Amendment, the United States Constitution guarantees a criminal defendant " 'a meaningful opportunity to present a complete defense.' " <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)[14] (quoting <u>Crane v. Kentucky</u>, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)). The fundamental due process right to present a defense is the right to offer testimony and compel the attendance of a witness. <u>Taylor v. Illinois</u>, 484 U.S. 400, 409, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988). However, there is a significant difference between the

---

[14] Internal quotation marks omitted.

compulsory process clause and most rights protected by the Sixth Amendment. The defendant's right to compulsory process and to present testimony is not absolute. "[M]ore than the mere absence of testimony is necessary to establish a violation of the right." United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982).

The defendant's right to present a defense is subject to "established rules of procedure and evidence." Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). "The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor, 484 U.S. at 410; see also Jones, 168 Wn.2d at 720.

We apply a two-step process to review evidentiary rulings for an abuse of discretion and consider de novo whether the rulings deprive the defendant of his Sixth Amendment right to present a defense. State v. Arndt, ___ Wn.2d ___, 453 P.3d 696, 703 (2019).

Evidence of character is generally inadmissible to prove conformity on a particular occasion. ER 404(a). However, ER 404(a)(1) permits a defendant to introduce evidence of a pertinent character trait to the charged crime. " ' "Pertinent," as used in ER 404(a)(1), is synonymous with "relevant." ' " State v. Perez-Valdez, 172 Wn.2d 808, 819, 265 P.3d 853 (2011)[15] (quoting City of Kennewick v. Day, 142 Wn.2d 1, 6, 11 P.3d 304 (2000)). Therefore, " 'a pertinent character trait is one that tends to make the existence of any material fact more or less probable.' " Perez-Valdez, 172 Wn.2d at 819-20[16] (quoting Day, 142 Wn.2d at 6).

---

[15] Internal quotation marks omitted.
[16] Internal quotation marks omitted.

28

Pillon argues the testimony of defense witnesses regarding his reputation for protecting the community from harm is relevant to the determination of whether he knowingly engaged in conduct that placed the natural resources of the State in imminent danger of harm in violation of the Hazardous Waste Management Act and whether he intended to engage in the business of wrecking vehicles. The testimony submitted in the Contingent Stipulation does not support his argument. Pillon's friends and neighbors Douglas Bandelin, Ken Osborne, and Mike Pruitt express personal opinions about Pillon and his property. Friends and neighbors Clint Cave, Raymond Cox, and Jarod Wood describe Pillon's efforts to abate criminal activity in the neighborhood and improve safety. Friend and neighbor Amy McGann and King County Sheriff Detective Sam Speight describe Pillon's efforts to abate drug houses. The testimony of former Renton Mayor Dennis Law addresses Pillon's community service activities. The testimony of WSP Trooper Padgett describes the "respectful" interactions she had with Pillon in 2002 and 2006, and the 2007 decision of King County Hearing Examiner Stafford Smith concerns Pillon's appeal of a 2002 code enforcement action against him. The testimony of the friends and neighbors in not relevant to deciding whether Pillon knowingly engaged in conduct that placed the natural resources of the state in imminent harm. The testimony of Trooper Padgett and the decision of Smith were not related or relevant to the charges from 2015 through 2016. The court did not abuse its discretion in ruling the testimony was not relevant.[17]

---

[17] As previously noted, Pillon conceded the testimony of King County River and Floodplain Management Section Manager Bleifuhs should be excluded.

Violation of Right to a Fair Trial

Pillon contends the court violated his right to a fair trial by asking the State's expert witness Fowlow leading questions about imminent harm in violation of the Hazardous Waste Management Act.

The right to a fair trial is a "fundamental liberty" protected by the Fourteenth Amendment to the United States Constitution and article I, section 3 of the Washington State Constitution. Estelle v. Williams, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976); State v. Davis, 141 Wn.2d 798, 824, 10 P.3d 977 (2000). "A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955); State v. Moreno, 147 Wn.2d 500, 507, 58 P.3d 265 (2002).

In general, a trial court does not violate the due process right to a fair trial by asking questions. Moreno, 147 Wn.2d at 506-12. Courts have the authority to interject and question witnesses and may ask a witness to clarify testimony. ER 614(b); In re Welfare of Burtts, 12 Wn. App. 564, 577, 530 P.2d 709 (1975); United States v. Morgan, 376 F.3d 1002, 1008 (9th Cir. 2004). However, the due process right to a fair trial is implicated where the court crosses the line from neutral arbiter to advocate. See Moreno, 147 Wn.2d at 509-511. Although a judge has broad discretion to question witnesses in a bench trial, the judge cannot "take charge of a party's case or . . . become a clear partisan." 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 614.5, at 618 (6th ed. 2016); Moreno, 147 Wn.2d at 509-511.

In determining whether interjections and questions violate the due process right to a fair trial, we consider the proceedings as a whole and examine a number of factors,

including the frequency and nature of the court's questions, whether the court waited until after counsel questioned the witness, whether the court's questions were clarifying or adversarial, whether the court interjected sua sponte in favor of one party, whether the questioning was impassioned or accusatory, and whether the court usurped counsel's role. See Moreno, 147 Wn.2d at 507-12; United States v. Pena-Garcia, 505 F.2d 964, 967 (9th Cir. 1974); United States v. Saenz, 134 F.3d 697, 702-05 (5th Cir. 1998); United States v. Singer, 710 F.2d 431, 436-37 (8th Cir. 1983); United States v. Van Dyke, 14 F.3d 415, 418-20 (8th Cir. 1994).

Here, the record does not support the argument that the trial court's questions violated Pillon's right to a fair trial. The record shows the court posed two clarifying questions to USEPA expert and emergency management and response coordinator Fowlow.

During cross-examination, Pillon asked Fowlow:

Q. Now, as we discussed the significance of these samples that day [of our meeting], do you recall me asking if you thought it had reached a level where it represented imminent danger to the public?
A. Yes.
Q. And do you recall your answer?
A. Well, I believe that my answer would be that based on the sample results, yes, there were several samples that I would consider to be an imminent and substantial threat.
Q. Do you recall in particular terms when I asked you if you felt that just then, based on what you had seen, that you would declare that site an imminent danger?
This moment in time I'm referring to is at that meeting, let me ask you yes or no if you used the term imminent danger or anything close to that?
A. No, I'm — I'm sorry, I don't recall what I said at that moment.
I mean, I could tell that you based on the results I have, if you're talking about soil, you're talking about the product samples, it would be different. But, you know.

At the conclusion of the cross-examination, the court asked Fowlow:

> This search warrant was just a little over two years ago in February of 2016. Do you have any professional concerns that presumably things are still in the same state now as they were then with respect to the materials you found in your — your samples?
> THE WITNESS: Yes. If I'm following the question, you're asking am I still concerned about the material on there? Yes.

The court then asked Fowlow:

> And do you have any doubt in your mind that there was a[n] imminent danger at the time that you — I know you didn't get your results for a little bit but the at the time you took the samples in 2016, do you have any question — any professional question in your mind at all that there was an imminent danger to the public?
> THE WITNESS: There was no question to me.
> THE COURT: Okay.
> MR. PILLON: I'm sorry, I didn't quite understand that. I — I got the answer, but I wasn't sure of the question, Your Honor.
> THE COURT: I asked if he had any doubt in his mind based on his professional experience in 2016 at the time that he collected those samples that there was an imminent danger to the public and he said no, he didn't.
> MR. PILLON: Thank you.

Pillon also claims the record shows the trial judge "prejudged" his case. The record does not support his argument. During the recross-examination of Fowlow, Pillon asked the court for clarification:

> [C]learly the photos themselves show that this is not a border to border hazardous material site or a Super Fund site.
> What I need to be able to do to phrase part of my argument downstream is get some clarification on that.

In response, the court stated:

> Obviously you have a different spin on it. I have seen many photos of your property, both from the ground as well as aerial. I understand it's a big piece of property, but the State is not required to show that 10 acres by 10 acres was completely part of this whole series of events that led to the current charges.
> They have focused on a significant portion — I mean, by doing the math I'm assuming 40 percent of the property means that

32

approximately four acres of 10 acres has concerns. That's sort of the inference that I'm drawing based on what this witness has testified to.

So I don't know if you have a follow-up question from this witness or —.

Pillon objected on the grounds that the court "clearly expressed here a prejudgment."

I must note for the record that the Court's clearly expressed here a prejudgment. I would offer, then, that we have the areas that we've talked about surveyed so that we can establish whether or not they amount to four acres.

The court disagreed with Pillon:

THE COURT: — [O]ne, I don't haven't prejudged and I do take some offense at that.

Number two, you can put on whatever evidence you want. This was this witness's opinion that it was about 40 percent. If you have a different perspective, that's certainly worthwhile hearing.

I can see that there's a lot of trees around this property, but I also have seen the photos and the aerials that do show that there is a substantial area that is of the area the State has concerns over.

So, I mean, we're now in day, what, six of testimony or something of that nature. I mean, this has been going on for a while now and will continue to go on until we've heard all the evidence; but I don't know if you have any further questions of this witness.

We conclude the court appropriately asked clarifying questions and the record does not show bias or violation of Pillon's right to a fair trial.

Cumulative Error

Pillon also contends cumulative error deprived him of the right to a fair trial. The cumulative error doctrine does not warrant reversal in this case. The application of the doctrine is limited to instances where "several trial errors . . . standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Where, as here, there are no errors

33

or the errors had little or no effect on the outcome of the trial, the cumulative error doctrine does not apply.  Greiff, 141 Wn.2d at 929.

We affirm the conviction of violation of the Hazardous Waste Management Act, count 1; and wrecking vehicles without a license and with a prior conviction, count 2.

WE CONCUR:

---

\* The Washington Supreme Court has appointed Judge Schindler to serve as a judge pro tempore pursuant to RCW 2.06.150.