[No. 23480-7-II. Division Two. April 30, 1999.]
CHILDREN'S HOSPITAL AND MEDICAL CENTER, *Appellant*, v. THE DEPARTMENT OF HEALTH, ET AL., *Respondents*.

*Paul L. Ahern* of *Sandler Ahern & McConaughy*, for appellant.

*Christine O. Gregoire, Attorney General* and *Richard McCartan, Assistant*; and *Stephen I. Pentz* of *Bennett Bigelow & Leedom*, for respondents.

HUNT, J. — Children's Hospital and Medical Center appeals dismissal of its lawsuit against the Washington State Department of Health challenging the Department's determination that Tacoma General Hospital could perform pediatric open heart surgeries without a Certificate of Need (CN) review. Holding that CN review is mandatory, we reverse.

## FACTS

Children's Hospital and Medical Center (Children's) is a

208-bed acute care pediatric hospital in Seattle. Until 1997, Children's was the only hospital in Western Washington that offered the full range of specialized pediatric cardiac care services,[1] including pediatric open heart surgery, elective therapeutic cardiac catheterization,[2] and nonemergent interventional cardiology procedures.[3] In 1997, Children's handled 443 cardiac catheterization cases and 381 pediatric open heart surgery cases, performing 35 different procedures. The three most common procedures comprised only 30 percent of the total cases. Many of the other procedures are performed only once or twice a year.

The American Academy of Pediatrics (AAP) has issued guidelines for pediatric heart facilities. For example: a pediatric cardiology center must be staffed by a team of pediatric specialists and subspecialists; special equipment is necessary; "at least 100 pediatric cardiac surgical procedures [ ] per year are necessary for the professional team to maintain skills"; and "Competing low-volume programs in close geographic proximity dilute case material and make it difficult for any hospital to maintain adequate experience." 87 PEDIATRICS, Apr. 1991, at 576, 579. Thus, for any given hospital, there is a direct correlation between a high volume of pediatric open heart surgery cases and a low mortality rate.

In May 1997, Tacoma General Hospital (Tacoma General), located about 40 miles from Children's, sought a determination from the Washington State Department of Health (Department) that it could begin performing certain pediatric cardiac services and operations without the

---

[1] For ease of reference, we refer to these procedures collectively as "pediatric open heart surgery," even though the other listed procedures are also at issue.

[2] Elective therapeutic cardiac catheterization is less invasive in nature than actual surgery. "Therapeutic cardiac catheterization means passage of a tube or other device into the coronary arteries or the heart chambers to improve blood flow." WASHINGTON ADMINISTRATIVE CODE (WAC) 246-310-020(1)(d)(i)(E).

[3] Various hospitals are permitted to perform emergency cardiac procedures on pediatric patients. At issue here is the performance of such services where there are time and opportunity to transport pediatric patients safely before performing complicated surgeries.

Department's first undertaking a Certificate of Need review under RCW 70.38.[4] In a letter dated July 11, 1997, the Department declared that CN review was not necessary because pediatric services would be split between Tacoma General and Mary Bridge Children's Hospital (Mary Bridge), located in the same building complex: Tacoma General would perform all pediatric open heart surgery and/or pediatric percutaneous translumenal coronary angioplasty (PTCA)[5] services, while Mary Bridge would provide post-surgical care.[6]

On August 8, 1997, Children's filed a petition for judicial review[7] of the Department's determination that no CN review was necessary before Tacoma General could begin performing pediatric open heart surgery and PTCA services. Children's contended that: (1) pediatric open heart surgery is a "new tertiary health service" for Tacoma General under RCW 70.38.105(3) and (4)(f), for which CN review is mandatory; and (2) WAC 246-310-020(1)(d)(i)(G) defines pediatric open heart surgery as a "specialized inpatient pediatric service," for which CN review is also mandatory. Children's did not seek to prevent Tacoma General from offering these services; rather, it sought to compel the Department to conduct CN review to determine whether another provider of pediatric open heart surgical services is warranted for this region.

Tacoma General responded that: (1) Children's failed to

---

[4]An apparent anomaly exists under the CN law's provisions for review of Departmental actions: If the Department determines that CN review is necessary, there are provisions for public notice and comment through an administrative process. WAC 246-310-160; WAC 246-310-170. But if the Department determines that no CN review is necessary, an aggrieved party's only remedy is to file suit in superior court—no administrative process exists to address this occurrence. *See* WAC 246-310-050; *see also* RCW 34.05.570(4)(b).

[5]PTCA is a subcategory of elective therapeutic cardiac catheterization. WAC 246-310-020(1)(d)(i)(E) provides that: "PTCA means the treatment of a narrowing of a coronary artery by means of inflating a balloon catheter at the site of the narrowing to dilate the artery[.]"

[6]Mary Bridge has not been approved to provide pediatric open heart surgery or PTCA services.

[7]Pursuant to RCW 34.05.570(4)(b).

state a claim upon which relief could be granted; (2) the superior court lacked jurisdiction over the subject matter of the action; (3) Children's lacked standing[8] to obtain judicial review of the Department's July 11, 1997, letter; and (4) Children's had not been substantially prejudiced by the action about which it complains. The Department responded that: (1) it had properly determined that no CN review was necessary before Tacoma General could begin performing pediatric cardiac services; and (2) Children's had failed to show that it had been substantially prejudiced by the Department's failure to conduct CN review.

After a trial on briefs and affidavits, the superior court found that Children's was not entitled to relief under RCW 34.05.570(4),[9] affirmed the Department's determination, and dismissed Children's petition for judicial review.

## ANALYSIS
### I. STANDARD OF REVIEW

■ Under the Administrative Procedure Act[10] (APA), the party challenging the validity of an agency action has the "burden of demonstrating the invalidity of [that] agency action[.]" RCW 34.05.570(1)(a). We review the Department's action under RCW 34.05.570(4):[11]

Relief for persons aggrieved by the performance of an agency

---

[8]Although Tacoma General argued below that Children's lacked standing to challenge the Department's action, it does not pursue this issue on appeal. The Department explicitly acknowledges that Children's has standing.

[9]Because the record before the agency consisted of one letter from Tacoma General to the Department and the Department's July 11, 1997, reply letter, the superior court took new evidence, an action permissible under RCW 34.05.562. "[W]here the information needed for review is contained in the superior court record of proceedings, not the agency record, the appellate tribunal will look to the superior court record." *Waste Management of Seattle, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 621, 634, 869 P.2d 1034 (1994).

[10]RCW 34.05.001-.903.

[11]Under the APA, there are three categories of judicial review: (1) "Review of rules[,]" RCW 34.05.570(2); (2) "Review of agency orders in adjudicative proceedings[,]" RCW 34.05.570(3); and (3) "Review of other agency action[,]" RCW 34.05.570(4). The Department's July 11, 1997, letter is neither a rule nor an order resulting from an adjudicative proceeding; thus, it is an "other agency action."

action, including the exercise of discretion, or an action under (b) of this subsection can be granted only if the court determines that the action is:

 (i) Unconstitutional;

 (ii) Outside the statutory authority of the agency or the authority conferred by a provision of law;

 (iii) Arbitrary or capricious; or

 (iv) Taken by persons who were not properly constituted as agency officials lawfully entitled to take such action.

RCW 34.05.570(4)(c). Children's alleges that the Department's determination, that CN review was not necessary, is contrary to law and is arbitrary and capricious, under subsections (ii) and (iii), respectively. An agency action is arbitrary or capricious when the action is a "willful and unreasoning action in disregard of facts and circumstances." *Washington Waste Sys., Inc. v. Clark County*, 115 Wn.2d 74, 81, 794 P.2d 508 (1990).

 Where the interpretation of statutory provisions is at issue, we review de novo. *Seattle Bldg. & Constr. Trades Council v. Apprenticeship & Training Council*, 129 Wn.2d 787, 799, 920 P.2d 581 (1996). We interpret a statute to "ascertain and give effect to the Legislature's intent as manifested in the statute's express language." *Peacock v. Public Disclosure Comm'n*, 84 Wn. App. 282, 286, 928 P.2d 427 (1996). "Rules of statutory construction, which apply equally to administrative rules and regulations, require statutes to be given a rational, sensible construction." *State v. McGinty*, 80 Wn. App. 157, 160, 906 P.2d 1006 (1995).

 We generally give "substantial weight . . . to the agency's view of the law if it falls within the agency's expertise in that special field of law." *Purse Seine Vessel Owners Ass'n v. Department of Fish & Wildlife*, 92 Wn. App. 381, 389, 966 P.2d 928 (1998). Nonetheless, we have the "ultimate responsibility to see that the rules are applied consistently with the policy underlying the statute."

*Nielsen v. Employment Sec. Dep't*, 93 Wn. App. 21, 29, 966 P.2d 399 (1998).[12]

## II. CERTIFICATE OF NEED REVIEW

■ In enacting RCW 70.38, the State Health Planning and Resources Development Act, the Legislature sought to oversee development of Washington's health and medical resources "in a planned, orderly fashion, consistent with identified priorities and without unnecessary duplication or fragmentation[.]"[13] RCW 70.38.015(2). It created the CN program

> to control costs by ensuring better utilization of existing institutional health services and major medical equipment. Those health care providers wishing to establish or expand facilities or acquire certain types of equipment are required to obtain a CN, which is a nonexclusive license.

*St. Joseph Hosp. & Health Care Ctr. v. Department of Health*, 125 Wn.2d 733, 736, 887 P.2d 891 (1995). RCW

---

[12]The *Nielsen* court rejected an agency's interpretation of its own rule that, although plausible, was inconsistent with the expressed intent of the Legislature. 93 Wn. App. at 33.

[13]RCW 70.38.015 provides:

It is declared to be the public policy of this state:

(1) That health planning to promote, maintain, and assure the health of all citizens in the state, to provide accessible health services, health manpower, health facilities, and other resources while controlling excessive increases in costs, and to recognize prevention as a high priority in health programs, is essential to the health, safety, and welfare of the people of the state. . . . Involvement in health planning from both consumers and providers throughout the state should be encouraged;

(2) That the development of health services and resources, including the construction, modernization, and conversion of health facilities, should be accomplished in a planned, orderly fashion, consistent with identified priorities and without unnecessary duplication or fragmentation[.]

The Legislature acted in response to the National Health Planning and Resources Development Act of 1974, Pub. L. No. 93-641, 88 Stat. 2225 (repealed 1986). One purpose of the federal law was to control health care costs. Congress was concerned "that marketplace forces in this industry failed to produce efficient investment in facilities and to minimize the costs of health care[.]" Among the specified functions was the administration of a CN program. *St. Joseph Hosp. & Health Care Ctr. v. Department of Health*, 125 Wn.2d 733, 735-36, 887 P.2d 891 (1995).

70.38.105(1) authorizes the Department of Health to administer the CN program; and "RCW 70.38.135(3) gives the Secretary of the Department authority to promulgate rules setting up the process for obtaining a CN." *St. Joseph*, 125 Wn.2d at 736. These rules are found in WASHINGTON ADMINISTRATIVE CODE (WAC) chapter 246-310.

In administering the CN program, the Department must consider: the special needs and circumstances of children's hospitals, RCW 70.38.115(2)(f); and such factors as the "efficiency and appropriateness of the use of existing services and facilities similar to those proposed[.]" RCW 70.38-.115(2)(h).

### A. "NEW TERTIARY HEALTH SERVICE"

■ Certificate of Need review is required before a hospital can institute a "new tertiary health service."[14] A "*new* tertiary health service" is a "tertiary health service" that was "not offered on a regular basis by, in, or through such health care facility . . . within the twelve-month period prior to the time such services would be offered[.]" RCW 70.38.105(4)(f).

RCW 70.38.025(14) defines "tertiary health service" as "a specialized service that meets complicated medical needs of people and requires sufficient patient volume to optimize provider effectiveness, quality of service, and improved outcomes of care." The Department has further defined the term "tertiary health services" to include the following:

(A) Specialty burn services[;]

(B) Intermediate care nursery and/or obstetric services level II[;]

(C) Neonatal intensive care nursery and/or obstetric services level III[;]

---

[14]RCW 70.38.105(3) prohibits any person from engaging in an undertaking subject to CN review without first having received either a CN from the Department or an exception granted by the Department "in accordance with this chapter."

 (D) Transplantation of specified solid organs[;]

 (E) *Open heart surgery* and/or elective therapeutic cardiac catheterization including elective percutaneous translumenal coronary angioplasty (PTCA)[;]

 (F) Inpatient physical rehabilitation services level I[; and]

 (G) *Specialized inpatient pediatric services.*

WAC 246-310-020(1)(d)(i)(A-G). (Emphasis added.)[15]

We agree with Tacoma General and the Department that pediatric open heart surgery was subsumed within one of the above "tertiary health service" categories. We disagree, however, that the appropriate category is the general "open heart surgery" category. WAC 246-310-020(1)(d)(i)(E). We hold that: pediatric open heart surgery is not simply a subcategory of general "open heart surgery" under WAC 246-310-020(1)(d)(i)(E); rather, pediatric open heart surgery constitutes a "tertiary health service" falling within the "specialized inpatient pediatric services" category of WAC 246-310-020(1)(d)(i)(G).

### 1. Adult and Pediatric Open Heart Surgery Distinguished

WAC 246-310-261 clearly differentiates between pediatric and nonpediatric open heart surgeries.[16] WAC 246-310--261(5)(e) specifically defines "open heart surgeries" as *excluding* "[a]ll pediatric surgeries (ages fourteen and under). . . ." WAC 246-310-261(3)(b) requires that hospitals seeking CN for *general* (adult) open heart surgery must demonstrate that they can meet "one hundred ten percent of the minimum volume standard" and that the

---

[15]In the Department's initial emergency regulations, "pediatric open heart surgery" was a specified category of "tertiary health service." But when the Department promulgated the permanent regulations, pediatric open heart surgery was no longer listed as a separate category of "tertiary health service."

[16]Neither the Department nor Tacoma General disputes the complicated nature of pediatric open heart surgery. At oral argument Children's counsel underscored the uncontroverted differences: Essentially, adult open heart surgery involves one of several standard procedures on a mature, previously functioning heart; whereas pediatric heart surgery may involve myriad procedures on fetal or young hearts that are either not yet fully formed or have parts missing.

surgeries counted toward this standard "must be appropriate for the proposed program (*i.e., pediatric and recognized complicated cases would be excluded*)." (Emphasis added.)[17] Thus, under its own regulations, the Department treats pediatric and nonpediatric heart surgeries differently for CN purposes.

## 2. Specialized Inpatient Pediatric Service

The Department's list of "tertiary health services" includes "specialized inpatient pediatric services," defined as follows: "The service is designed, staffed, and equipped to treat complex pediatric cases for more than twenty-four hours." WAC 246-310-020(1)(d)(i)(G). Children's argues that pediatric open heart surgery clearly falls within this definition. The Department and Tacoma General argue that this category is inapplicable because pediatric open heart surgical procedures do not last more than 24 hours and, therefore, pediatric heart patients are never at Tacoma General more than 24 hours; instead, they are immediately transferred to Mary Bridge for postsurgical care. The Department and Tacoma General further argue that the Department intends this regulation to be applied in a "programmatic"[18] sense rather than to specific services.

### a. Length of Complex Pediatric Surgical Procedures As Compared to Cases

■ Where a regulation is clear and unambiguous, a court should apply its plain language and may not look beyond the language to consider the agency's interpretation. *Multicare Med. Ctr. v. Department of Soc. & Health Servs.*, 114 Wn.2d 572, 591, 790 P.2d 124 (1990); *see also In re Estate of Little*, 106 Wn.2d 269, 283, 721 P.2d 950 (1986) ("We will

---

[17]*See also* WAC 246-310-261(5)(a), "Age-specific categories." The youngest age listed for general open heart surgery is 15.

[18]In other words, the Department views this regulation as applying only where a hospital that provides no pediatric procedures wishes to establish a new pediatric program or unit providing a full complement of services to pediatric patients requiring complex care.

give words in a statute their plain and ordinary meaning unless a contrary intent appears.'').

Here, the plain language of the regulation refers to "complex pediatric *cases*," not "procedures," lasting longer than 24 hours. WAC 246-310-020(1)(d)(i)(G). (Emphasis added.)[19] Moreover, the regulation does not use as a threshold the length of a patient's *stay* at one particular facility; rather, it focuses on whether a patient's "case" requires more than 24 hours of treatment. The Department and Tacoma General do not dispute that pediatric heart surgery "cases" require treatment for more than 24 hours because "cases" include recovery time, which exceeds 24 hours. Thus, it is immaterial that the surgical procedures themselves seldom last longer than 24 hours.[20]

### b. "Programmatic"

We give no deference to an agency's interpretation of legislation where the language of the statute is unambiguous. *Seattle Bldg.*, 129 Wn.2d at 799. The Department's interpretation of the term "specialized inpatient pediatric services," as applying only in a "programmatic" sense, is inconsistent with the plain language of both its own regulation[21] and RCW 70.38.025(14).

### B. Legislative Acquiescence

Tacoma General argues that, although the Legislature has amended the CN law several times since its passage in

---

[19]"[W]hen faced with an unambiguous regulation, the court may not speculate as to the intent of the regulation or add words to the regulation." *Multicare Med.*, 114 Wn.2d at 591.

[20]Because we hold that pediatric open heart surgery is a specialized inpatient pediatric service and a new tertiary service for Tacoma General Hospital, we need not address Children's argument that permitting Tacoma General to perform pediatric open heart surgeries and Mary Bridge to provide the after-surgery care violates RCW 70.38.105(6).

[21]Therefore, we need not address Children's argument that the Department's "programmatic" definition is actually a "rule" promulgated in violation of the APA.

1979, it has never amended either the provisions regarding the Department's list of "tertiary health services" under the WAC or the Department's interpretation of "specialized inpatient pediatric services" as applying only in the programmatic sense. Thus, Tacoma General argues, the Legislature has acquiesced in the Department's view that offering pediatric open heart surgery by a hospital that already performs adult open heart surgery does not necessitate CN review. We disagree.

 The doctrine of legislative acquiescence does not apply in situations such as this one:

> [This] rule is to be applied only in those instances where it is apparent that the subsequent legislative consideration involves the same or similar issue as that which is covered by the administrative rule. . . . We do not believe it is reasonable to assume the legislature considered the impact of an administrative rule on a portion of that statute which it was not considering at the time it was amending other portions of the statute.

*Pringle v. Washington*, 77 Wn.2d 569, 573-74, 464 P.2d 425 (1970). Conversely, where it is not apparent that the Legislature knows that an agency is interpreting a regulation in a way that seems inconsistent with the clear language of the regulation, the doctrine of silent acquiescence is inapplicable. *See id.* at 573-74.

Neither Tacoma General nor the Department presented evidence that: (1) the Legislature has ever considered whether "pediatric open heart surgery" should be included on the Department's list of "tertiary health services"; or (2) the Legislature, or anyone outside the Department, is aware that the Department interprets "specialized inpatient pediatric procedure" as applying only in the "programmatic" sense. We agree with Children's that, instead of applying the doctrine of silent acquiescence, we should interpret the regulation in a manner that is consistent with both its plain language and the Legislature's intent in

requiring CN review for new tertiary services. *See Somer v. Woodhouse*, 28 Wn. App. 262, 270, 623 P.2d 1164 (1981).

## C. ARBITRARY AND CAPRICIOUS

 Under the arbitrary and capricious standard, we reverse only if an agency action was "willful and unreasoning, and taken without regard to the attending facts or circumstances." *ITT Rayonier, Inc., v. Dalman*, 122 Wn.2d 801, 809, 863 P.2d 64 (1993). Judging whether an agency's decision was arbitrary and capricious involves evaluating the evidence considered by the agency in making its decision. *Pierce County Sheriff v. Civil Serv. Comm'n*, 98 Wn.2d 690, 695, 658 P.2d 648 (1983). "Where there is room for two opinions, action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached." *Id.* at 695 (citation omitted). Although we must give due deference to the "specialized knowledge and expertise of the administrative agency," *Hayes v. Yount*, 87 Wn.2d 280, 289, 552 P.2d 1038 (1976), such deference does not extend to agency actions that are arbitrary, capricious, and contrary to law.

Children's lists several factual reasons demonstrating the arbitrariness and capriciousness of the Department's determination that it need not conduct CN review of Tacoma General's request to perform pediatric open heart surgeries. The Department is required to enforce the law in accordance with RCW chapter 70.38. RCW 70.38.105(1). In order to determine whether CN review is necessary, we examine whether the Department acted arbitrarily or capriciously in light of the relevant facts and statutory provisions.

Neither the Department nor Tacoma General disputes the facts upon which Children's relies. As noted above, until Tacoma General offered pediatric open heart surgery, Children's was the only hospital in western Washington performing such operations. In 1997, Children's handled 381 pediatric open heart surgery cases, including 35 different procedures, of which the three most common proce-

dures comprised only 30 percent; many of the other procedures are performed only once or twice a year. Children's also handled 443 cardiac catherization cases in 1997.

The American Academy of Pediatrics guidelines call for "at least 100 pediatric cardiac surgical procedures . . . per year . . . for the professional team to maintain skill." 87 PEDIATRICS, Apr. 1991 at 576, 579.[22] These guidelines are consistent with a Harvard Medical School study of the mortality rates of pediatric cardiac patients, which concluded that children who undergo heart surgery have a much lower risk of dying if the surgery is performed at a hospital which handles more than 300 cases annually.[23] Conversely, the guidelines discourage locating multiple providers of pediatric open heart surgery within a given region because "[c]ompeting low volume programs in close geographic proximity dilute case material and make it difficult for any hospital to maintain adequate experience." 87 PEDIATRICS, Apr. 1991 at 579.

Tacoma General estimates that it will perform, at most, 57 pediatric cardiac procedures per year; the number could be as low as 17.[24] Thus, according to the medical evidence before us, Tacoma General's plans to perform pediatric open heart surgery appear to violate the AAP guidelines. Moreover, Tacoma General is not a children's hospital nor does it have a pediatrics department. Instead, it handles

[22]None of the parties has contested the authority of these guidelines, nor are any other guidelines or standards before us.

[23]The study concluded that the mortality rate was three percent in hospitals performing more than 300 operations per year, 7.9 percent in hospitals performing 10-100 operations per year, and 18.5 percent in hospitals performing fewer than ten operations per year. 95 PEDIATRICS, Mar. 1995 at 323, 326.

[24]Tacoma General estimated it would take between 15 and 50 percent of Children's patients residing in the Olympia/Tacoma area and that 29 percent of Children's cardiac surgery patients come from the Tacoma area. In 1997, Children's performed 381 cardiac operations; thus, according to Tacoma General's own estimates, it would perform at most 57 operations per year (.5 x .29 x 381), and potentially as few as 17 operations per year (.15 x .29 x 381). Even if Tacoma General's subsequent experience may have exceeded the above estimates, the need for CN review is not obviated.

pediatric patients in cooperation with Mary Bridge, which is not authorized to perform pediatric open heart surgery.[25]

Children's asserts and Tacoma General does not dispute that the vast majority of pediatric heart surgery is non-emergent. Thus, that children in the Olympia/Tacoma area must be transported to Children's should not increase mortality.[26] Moreover, Tacoma General does not argue that there is a need for a second pediatric open heart surgery provider in the region; and it does not dispute that Children's has the ability to serve additional patients.

The Legislature implemented Certificate of Need review to maximize the quality of specialized medical care and its affordability by avoiding unnecessary duplication of services. The Legislature "authorized and directed" the Department "to implement the certificate of need program in this state *pursuant to the provisions of this chapter.*" RCW 70.38.105(1). (Emphasis added.) Although the Department can promulgate implementing regulations, it has no power to contravene this legislative directive.

Here, the record does not reflect that the Department used any "specialized knowledge and expertise" in determining that CN review of Tacoma General's application was unnecessary. Rather, the Department's determination appears to have been based on an erroneous interpretation of the statutes and its own regulations as applied to the facts. Given the undisputed medical evidence, the language of the CN law, and the regulations interpreting it, we hold that the Department's conclusion, that CN review of

---

[25]Our opinion's focus on the legal requirement for CN review is not intended to reflect upon Tacoma General's reputation for rendering quality care to its patients. Nor should this opinion be construed as reflecting upon Tacoma General's capacity to perform pediatric open heart surgery; that is the function of the Department's CN review.

[26]On the contrary, the guidelines and studies suggest that children's mortality rates may be decreased if south Puget Sound children are transported to Children's in Seattle, where there is greater experience and expertise by virtue of its greater number of pediatric cardiac patients.

Tacoma General's plan was not required by statute, was arbitrary and capricious.

### D. SUBSTANTIALLY PREJUDICED

A party seeking reversal of an agency action must show that it "has been substantially prejudiced by the action complained of." RCW 34.05.570(1)(d). Washington State courts have yet to define "substantial prejudice" under the APA.

 Tacoma General argues that Children's has failed to show "substantial prejudice" because Children's has not argued that permitting Tacoma General to perform pediatric open heart surgery would "significantly impact [Children's] financial status or threaten its economic viability." But Tacoma General cites no authority holding that "substantial prejudice" under the APA requires a showing of potential economic *failure*.

Children's argues that it will be "substantially prejudiced" if Tacoma General is permitted to perform pediatric open heart surgeries. In addition to lost revenue of more than one million dollars annually, Children's has presented evidence that pediatric mortality rates could rise as the number of surgeries performed falls. *See* 95 PEDIATRICS, Mar. 1995 at 326.

Although there are no Washington cases on point, the Supreme Court of Kentucky, in a similar case, held that Kentucky's Children's Hospital could bring an action to compel the state health department to conduct CN review before allowing a competitor pediatric hospital to perform pediatric cardiac catherization and open heart surgeries. *Humana of Kentucky, Inc. v NKC Hosps., Inc.*, 751 S.W.2d 369, 370 (Ky. 1988). NKC/Children's Hospital argued, as does Washington's Children's Hospital, that the department must follow the state health plan's directive to ensure that all existing pediatric cardiac services are operating at "satisfactory levels of utilization . . . in terms of both cost and quality" and that "no new pediatric open heart surgery

program . . . be initiated until each existing pediatric program is operating at a [specified] level[.]" *Id.* Although *Humana* focuses on the prejudice aspect of standing, rather than "substantial prejudice," it speaks to the same "zone of interest" raised by Children's here: a competitor's interest in maintaining "a quality, cost effective program." *Id.* at 373.[27] Harmonizing with *Humana*, we hold that both the economic injury and the potentially increased mortality rates cited by Children's constitute "substantial prejudice" within the APA meaning of the term.

## CONCLUSION

We hold that: (1) pediatric open heart surgery is a "specialized inpatient pediatric service" requiring CN review; (2) pediatric open heart surgery is a "tertiary health service" "new" to Tacoma General, requiring CN review; and (3) the Department's determination to the contrary was arbitrary and capricious. Accordingly, we reverse: (1) the Department's allowing Tacoma General to perform pediatric open heart surgery and related procedures without CN review; (2) the superior court order affirming the Department; and (3) the court's dismissal of Children's petition. Before Tacoma General may perform pediatric open heart surgery, the Department must first conduct CN review.

ARMSTRONG, A.C.J., and HOUGHTON, J., concur.

Reconsideration denied August 6, 1999.

Review denied at 139 Wn.2d 1021 (2000).

---

[27]Moreover, if Children's cannot meet the "substantial prejudice" test, then it is unlikely that anyone else could, and the APA right to review would be illusory.