# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| IMPACT PUBLIC SCHOOLS, | No. 57035-1-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| THE WASHINGTON STATE CHARTER SCHOOL COMMISSION, | |
| Respondent. | |

PRICE, J. — Impact Public Schools (Impact) appeals the superior court's order affirming the Washington State Charter School Commission's (Commission) "Notice of Deficiencies," "Corrective Action Plan," and "Corrective Action Compliance Calendar" (collectively "corrective actions") against Impact. The corrective actions asserted that Impact improperly screened students prior to enrollment, improperly enrolled students to kindergarten and sought public funding for four-year-old students, and defied the Commission's decision not to allow transitional kindergarten courses. Impact seeks judicial review under the Administrative Procedure Act (APA)[1], asserting the Commission's corrective actions were arbitrary and capricious and outside of the Commission's scope of authority.

We determine that Impact fails to show it is entitled to relief under either APA ground and affirm.

---

[1] Ch. 34.05 RCW.

No. 57035-1-II

FACTS

I. CREATION OF SALISH SEA ELEMENTARY AND CHARTER CONTRACT

Impact is a nonprofit corporation that operates public charter schools in Washington. In March 2019, Impact applied for approval from the Commission to establish and operate Salish Sea Elementary (SSE) as a charter school.

The approval process for SSE required Impact and the Commission to enter into a charter contract. The contract generally required SSE to "meet or exceed basic education standards" and required Impact to "operate at all times in accordance with Applicable Law . . . ." Admin. R. (AR) at 21, 29. The charter contract defined "Applicable Law" as "all local, state, and federal laws, ordinances, rules and regulations applicable to the operation of a charter school in the" state. AR at 15.

The charter contract further included an enrollment policy, which required SSE to be open to all students who wished to attend and stated, "There shall be no admission testing or other evaluation required of any applicant." AR at 61. In addition, the charter contract required SSE to report student enrollment in the same manner as public schools, including complying with reporting requirements to receive public funding allocated based on student characteristics.

II. SSE'S PLAN TO OFFER TRANSITIONAL KINDERGARTEN

SSE planned to offer kindergarten classes. But due to "local demand" from families with younger children, Impact intended to add transitional kindergarten (TK) classes to SSE. AR at 166.

TK, according to the Office of the Superintendent of Public Instruction (OSPI), "is a kindergarten program for children not yet age five who do not have access to high-quality early

2

learning experiences prior to kindergarten and have been deemed by a school district, through a *screening process* and/or other instrument(s), to be in need of additional preparation to be successful in kindergarten the following year." AR at 190. When a school district opts to offer TK classes, the district typically determines the process for evaluating students and establishing need for the students to enter TK to be ready for kindergarten the following year.

In December of 2019, Impact informed the Commission of their intent to offer TK classes. Impact explained that it did not believe offering TK was a modification that would require preauthorization by the Commission under the contract, but it still wanted to check with the Commission before implementation.

Although it did not receive an immediate response from the Commission, Impact then took steps to develop a TK program at SSE. Impact hired teachers, purchased TK curriculum, completed community outreach, and ultimately enrolled two full TK classes for the 2020-21 school year. Before enrollment in the TK classes, Impact asked the prospective students' families screening questions. The questions included inquiries into the child's history, including questions about the child's development, their abilities to recognize the alphabet and count, and the child's strengths and needs.

Months later, in May 2020, and notwithstanding Impact's preparations, the Commission determined that charter schools, including Impact, could not offer TK classes earlier than January 2021. The Commission reasoned that there was a lack of formal process for charter schools to petition the Commission to offer TK and there was no regulatory framework to support TK at that time.

The Commission notified Impact of its decision, explaining it believed preauthorization for TK was required because the "Commission and Impact did not contemplate TK as an option when Impact applied to the Commission to open SSE and when Impact signed the SSE charter contract." AR at 434. The Commission also explained there were conflicts with the requirements of TK enrollment and the laws governing charter schools—TK requires screening of students, but charter school laws prohibit charter schools from screening students.[2] RCW 28A.710.050(1) ("[A] charter school may not limit admission on any basis other than age group, grade level, or enrollment capacity."). On June 19, 2020, Impact requested reconsideration of the Commission's decision not to allow its TK classes for fall 2020, which was denied.

During this same timeframe in June 2020, Impact was required to show 80 percent enrollment as a condition precedent to SSE opening for the 2020-21 school year. On June 22, Impact submitted its enrollment information that showed the school would meet the 80 percent enrollment requirement. Impact, however, included the students screened for TK in its expected enrollment. In fact, about half of the reported enrolled students were four-year-olds screened for TK.

III. SSE OFFERS ADDITIONAL KINDERGARTEN COURSES

In July 2020, after receiving the Commission's decision denying its TK courses, Impact decided to open two additional kindergarten classes. At the same time, Impact called the families

---

[2] Although the charter contract's provision regarding enrollment policy gives Impact the ability to determine enrollment policies, it also states that there "shall be no admission testing or other evaluation required of any applicant" to SSE. AR at 61.

The purpose behind the prohibition on screening students, according to the Commission, is to keep charter schools open to all students, as opposed to allowing charter schools to select students based on academic ability.

of the children who had been enrolled in the TK classes. Impact notified the families that TK was no longer available, but then asked them if they would like their children shifted into kindergarten classes. Most families chose to enroll their children in kindergarten.

Many of the children who were shifted from TK enrollment to kindergarten were four years old. Because of their young age, these students were to be considered "early entrance to kindergarten" (EEK) students. Clerk's Papers (CP) at 553. During the phone calls with the families, Impact asked a series of "K Assessment Phone Interview Questions." AR at 605. The questions evaluated the EEK students' readiness for kindergarten and included inquiries about the child's development and ability to count. Impact also sent the families a written form to supplement the verbal assessment, asking four questions about the student's strengths and needs. No children were denied enrollment as EEK students as a result of the questions.

IV. INVESTIGATION AND CORRECTIVE ACTION

Later in the fall, OSPI became aware that Impact's enrollment numbers included four-year-olds enrolled as EEK students. Impact had requested and received about $790,000 of public funds from OSPI based on their enrollment of four-year-olds. In October 2020, OPSI informed the Commission about Impact's enrollment of the four-year-olds. The Commission then conducted an investigation which revealed that most of the enrolled four-year-olds were the same children that had initially been screened for TK classes.

The Commission issued a "Notice of Perceived Problem" (NPP) to Impact. The NPP identified the Commission's concerns with the kindergarten enrollment, including the

5

Commission's belief that the school was not authorized to access public funds for enrollment of children under five years of age.[3]

The Commission also took issue with Impact's screening process of the four-year-olds. The screening of TK and EEK students conflicted with laws prohibiting admission to charter schools based on criteria other than age group, grade level, or enrollment capacity. AR at 713. The Commission identified that neither the "Charter School Act"[4] (CSA) nor SSE's charter contract permits screening, but both TK and EEK admissions require screening prior to enrollment. The Commission further explained that individual students generally cannot meet the criteria for placement into both TK and EEK.[5]

Impact responded to the NPP by stating that enrolling four-year-olds as EEK students did not conflict with the contract, the CSA, or any other applicable law. Impact argued that the contract allowed it to make policies and procedures for student enrollment, thereby authorizing it to enroll

---

[3] Relevant to Impact and SSE accessing public funds, the charter contract incorporated assurances that SSE "report student enrollment in the same manner and based on the same definitions of enrolled students and annual average full-time equivalent enrollment as other public schools" and "comply with applicable reporting requirements to receive state or federal funding that is allocated based on student characteristics." AR at 59. These requirements mirror the requirements of RCW 28A.710.220 (charter schools required to report student enrollment in the same manner and based on the same definitions as public schools).

[4] Ch. 28A.710 RCW; LAWS OF 2016, ch. 241.

[5] According to the Commission, TK is intended to help four-year-olds be ready for kindergarten the following year, while EEK is appropriate for four-year-olds who are ready to enter kindergarten early and continue on to first grade the following year.

the four-year-olds as EEK students.[6]  Regarding screening, Impact contended that "when [it] was forced to postpone its TK program, it had not [yet] assessed, based on ability, whether the prospective TK students could succeed in a standard kindergarten program."  AR at 723.  Impact argued that after it postponed the TK program, it "*for the first time*" assessed whether TK enrollees would be successful in kindergarten as EEK students.  AR at 723.  Impact argued that the screening for EEK did not violate any prohibition on pre-enrollment screening because Impact did not limit admission on any basis.

Impact's response acknowledged that it was subject to the relevant WAC's that applied to funding of public schools and enrollment of four-year-olds into kindergarten—namely, chapter 392-121 WAC and chapter 392-335 WAC—but it asserted its EEK program "was conducted consistent with RCW 28A.150.220 and WAC chapter 392-335," and it therefore "did not access public funds improperly" by enrolling four-year-olds.  AR at 728.

After considering Impact's response, the Commission was unpersuaded.  On March 15, 2021, the Commission issued a Notice of Deficiencies (NoD).  The NoD identified several deficiencies, stating Impact had:

> Disregarded the Commission's denial of TK in May and June of 2020 by enrolling approximately 60 students who were not yet age five by August 31, 2020 (most of whom had previously been screened into TK).
>
> Required screening of approximately 60 applicants who were not yet age five by August 31, 2020 in the 2020-21 school year.
>
> Enrolled approximately 60 students who were not yet age five by August 31, 2020 in the 2020-21 school year.

---

[6] Impact quotes the charter contract's enrollment policy, which allows Impact to "determine all policies, processes, and procedures governing . . . enrollment at" SSE.  AR at 61.  Impact asserted this portion of the contract gave it "absolute discretion . . . to implement enrollment practices and procedures consistent with its mission."  AR at 726.

Proceeded with screening, enrolling, and educating students who were not yet age five by August 31, 2020, without the required legal or contractual authority.

Claimed and continues to claim many of these students for state apportionment purposes resulting in a misappropriation of public funds.

AR at 737. The NoD required Impact to propose a Corrective Action Plan (CAP) by March 26, 2021, to cure the deficiencies listed in it.

Impact responded to the NoD several weeks later by denying any deficiencies. Despite its denial, Impact provided a proposed CAP. Impact again acknowledged applicability of chapter 392-121 WAC and chapter 392-335 WAC, but asserted it complied with those rules.

The Commission and Impact proposed amendments to the CAP, and after several rounds of negotiations, the CAP was approved by the Commission on May 21, 2021. The final version of the CAP reasserted the same deficiencies as the NoD and required Impact to undertake certain remedies, such as not enrolling additional students under five years of age without Commission approval. Impact was also required to comply with the enrollment policies in the charter contract, including not screening students prior to enrollment unless they are approved to do so by the Commission for TK, EEK, or other programs in the future. However, Impact was not required to disenroll any existing students.

The Commission also provided Impact with a Corrective Action Compliance Calendar (CACC) for the due dates of reports and actions called for in the CAP.

V.  PETITION FOR JUDICIAL REVIEW

Before the CAP was finalized, Impact filed a petition for review of the Commission's NoD. In this petition, Impact reasserted that when it planned to offer TK at SSE, it had not assessed whether the students would be capable of succeeding in EEK. Impact then "embarked for the first

8

time on an assessment of whether the students slotted for the TK program would be capable of success in the standard kindergarten program," and determined those same students could "take advantage of the [] early enrollment option." CP at 7.

After finalization of the CAP and the CACC, Impact filed a second petition for review, arguing those documents erroneously concluded that Impact was in violation of the charter contract and statutory and regulatory provisions. Impact argued the CAP and CACC would increase the burden and expense of running SSE.

The superior court consolidated the two actions and ultimately affirmed the Commission's corrective actions, determining that the Commission acted within its statutory authority and not arbitrarily or capriciously.

Impact appeals.

ANALYSIS

Impact appeals the superior court's order affirming the Commission's corrective actions arguing that the NoD, CAP, and CACC should be set aside because the Commission, in enforcing these documents, acted outside of its statutory authority and was arbitrary and capricious.[7] Impact argues that its decision to enroll four-year-olds as EEK students was not contrary to law and it did not disregard the Commission's denial of permission to offer TK classes.

---

[7] Although Impact challenges the NoD, CAP, and CACC, the Commission asserts the CAP is the only final, reviewable agency action it issued against Impact. Impact argues that all three corrective actions were final and reviewable. Because all three corrective actions are based on the same alleged deficiencies, we do not resolve whether all or only some of the corrective actions are reviewable.

I. LEGAL PRINCIPLES

A. STANDARD OF REVIEW

The APA governs judicial review of agency actions, including what is termed "other agency action." *See* RCW 34.05.570(4). RCW 34.05.570(4)(c) allows judicial review of other agency action based on four grounds:

> Relief for persons aggrieved by the performance of an agency action, including the exercise of discretion, or an action under (b) of this subsection can be granted only if the court determines that the action is:
>
> (i) Unconstitutional;
>
> (ii) Outside the statutory authority of the agency or the authority conferred by a provision of law;
>
> (iii) Arbitrary or capricious; or
>
> (iv) Taken by persons who were not properly constituted as agency officials lawfully entitled to take such action.

Here, Impact argues it is entitled to relief under subsections (ii) and (iii), alleging the Commission acted outside of its authority and acted arbitrarily and capriciously.

"Under the arbitrary and capricious standard, we reverse only if an agency action was 'willful and unreasoning, and taken without regard to the attending facts or circumstances.' " *Child.'s Hosp. & Med. Ctr. v. Dep't of Health*, 95 Wn. App. 858, 871, 975 P.2d 567 (1999) (quoting *ITT Rayonier, Inc., v. Dalman,* 122 Wn.2d 801, 809, 863 P.2d 64 (1993)), *review denied*, 139 Wn.2d 1021 (2000). "Judging whether an agency's decision was arbitrary and capricious involves evaluating the evidence considered by the agency in making its decision." *Id.* " 'Where there is room for two opinions, action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached.' " *Id.* (quoting *Pierce County Sheriff v. Civil Serv.*

*Comm'n of Pierce County*, 98 Wn.2d 690, 695, 658 P.2d 648 (1983)). Our review of whether the agency action was arbitrary and capricious is de novo. *Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n*, 149 Wn.2d 17, 24, 65 P.3d 319 (2003).

When reviewing other agency action, we sit in the same position as the superior court and apply the standards of review directly to the record before the agency. *Id.* at 26. Under the APA, the party asserting invalidity of the agency action has the burden to show the invalidity of the action. RCW 34.05.570(1)(a).

B. STATUTORY AUTHORITY OF THE COMMISSION

The Commission is an "independent state agency whose mission is to authorize high[-]quality charter public schools throughout the state . . . and to ensure the *highest standards of accountability and oversight for these schools*." RCW 28A.710.070(1) (emphasis added). "The commission shall, through its management, supervision, and enforcement of the charter contracts and pursuant to applicable law, administer the charter schools it authorizes in the same manner as a school district board of directors administers other schools." RCW 28A.710.070(2). The Commission's oversight begins at the time of application for a charter contract. RCW 28A.710.100(1)(a)-(b).

The Commission has the authority as an "authorizer," under the CSA, to undertake corrective action against a charter school. RCW 28A.710.180. The Commission "must continually monitor the performance and legal compliance of the charter schools under its jurisdiction, including collecting and analyzing data to support ongoing evaluation according to the performance framework in the charter contract." RCW 28A.710.180(1). To fulfill its responsibilities, the Commission "may conduct or require oversight activities . . . including

conducting appropriate inquiries and investigations, if those activities are consistent with the intent of this chapter, adhere to the terms of the charter contract, and do not unduly inhibit the autonomy granted to charter schools." RCW 28A.710.180(2).

If the charter school's "performance or legal compliance appears unsatisfactory," the Commission "must promptly notify the school of the perceived problem and provide reasonable opportunity for the school to remedy the problem." RCW 28A.710.180(3). And the Commission "may take appropriate corrective actions or exercise sanctions . . . in response to apparent deficiencies in charter school performance or legal compliance. These actions or sanctions may include, if warranted, requiring a school to develop and execute a corrective action plan within a specified time frame." RCW 28A.710.180(4).

C. CREATION AND REQUIREMENTS OF CHARTER SCHOOLS

The creation of charter schools is authorized by the CSA. *See* RCW 28A.710.040. A charter school is a public school that is open to all children free of charge and operates separately from the common school system. RCW 28A.710.020(1)(a)-(b). The process of opening a charter school begins when a nonprofit applies for a charter contract. *See* RCW 28A.710.100(1)(a)-(b).

Once the charter school's contract is approved, the charter school "must operate according to the terms of its charter contract" and the CSA. RCW 28A.710.040(1). Charter schools must also comply with statutes and rules made applicable to them in their charter contracts. RCW 28A.710.040(3). But charter schools are exempt from "all *other* state statutes and rules applicable to school districts and school district boards of directors." RCW 28A.710.040(3) (emphasis added).

II. WITHDRAWAL OF ARGUMENT ABOUT SCREENING OF TK AND EEK STUDENTS

Impact initially argued that the Commission was either arbitrary and capricious or acting outside of the scope of its authority when it issued corrective actions based on Impact's screening activity of four-year-old TK and EEK enrollees to kindergarten classes. Impact asserted that it was not in violation of statutes preventing the use of enrollment criteria because it did not screen TK and EEK students before their enrollment to the school in kindergarten classes.

In its reply brief, Impact withdrew its argument that the Commission acted arbitrarily and capriciously "for concluding, based on [the] record, that Impact/SSE impermissibly conducted pre-enrollment evaluations of students." Appellant's Reply Br. at 22. At oral argument before this court, Impact confirmed it no longer challenges the Commission's corrective actions on this basis, thereby conceding that the Commission was correct in identifying its screening of students as a deficiency. *See* Wash. Court of Appeals oral argument, *Impact Pub. Schs. v. State Charter Sch. Comm'n*, No. 57035-1-II (May 4, 2023), at 2 min., 19 sec. through 2 min., 44 sec. (on file with court).

III. IMPACT IMPROPERLY SOUGHT PUBLIC FUNDS FOR ENROLLED FOUR-YEAR-OLDS

Impact argues that the Commission erred by concluding that Impact improperly sought public funds for enrolling four-year-olds. Impact contends that although the relevant statutes may require schools be accessible to children at least five years old, they do not *prohibit* schools from enrolling students who are four years old. Additionally, Impact argues that regulations requiring kindergarteners to be at least five years old for enrollment are not applicable because the CSA broadly exempts charter schools from provisions applicable to public school districts.

13

The Commission responds that the regulations related to funding of public schools require kindergarteners to be five years old and they do apply to charter schools because those rules (found in chapter 392-335 WAC) are incorporated through rules that are undisputedly applicable to charter schools (chapter 392-121 WAC).[8] We agree with the Commission.

The Washington Basic Education Act of 1977 (BEA), RCW 28A.150.200, generally requires public schools be accessible to "all students who are five years of age . . . and less than twenty-one years of age . . . ." RCW 28A.150.220(5)(a). This requirement is reiterated in RCW 28A.225.160(1), which states that schools shall be "open to the admission of all persons who are five years of age and less than twenty-one years."

It is true that the BEA stops short of forbidding four-year-olds from enrolling in kindergarten. And Impact is correct that the CSA does permit charter schools to operate outside of many of the regulations imposed upon traditional public schools. However, viewing, in combination, the statutes and regulations related to public funding and enrollment shows that the age requirements for kindergarten imposed on traditional public schools also apply to charter schools.

---

[8] During oral argument, Impact argued for the first time that the Commission's assertions about the applicability of these WAC provisions about funding were a "post hoc rationalization" that we should not consider. Wash. Court of Appeals oral argument, *Impact Pub. Schs. v. State Charter Sch. Comm'n*, No. 57035-1-II (May 4, 2023), at 6 min., 8 sec. through 6 min., 38 sec. (on file with court). We reject this argument. In its corrective actions, the Commission expressed general concerns about Impact seeking public funding for four-year-olds and included references to the specific rules at issue here. Although the Commission did not expressly outline in detail the application of these provisions, the parties' general arguments about public funding sufficiently raised these issues.

A. CHAPTER 392-335 WAC IS APPLICABLE TO IMPACT

As shown below, kindergarten enrollment is governed, in part, by chapter 392-335 WAC. Impact argues that it need not conform to these regulations because the CSA exempts it from rules that apply to school districts that are not specifically enumerated in the CSA. Because chapter 392-335 WAC is not specifically enumerated in the CSA but is applicable to school districts, Impact argues charter schools are not bound by the regulations.

Impact's position is not persuasive when the trail of applicable statutes and regulations is followed. As a first step, charter schools are required to operate in accordance with the CSA. RCW 28A.710.040(1). One of the CSA's provisions relates to the reporting of enrollment in order to receive public funds. The CSA requires charter schools to report their enrollment the same way as common public schools, including using the same definition of "enrolled students." RCW 28A.710.220(1) ("Charter schools must report student enrollment in the same manner, and based on the same definitions of enrolled students . . . as other public schools."). Unless these enrollment reporting requirements are followed, the charter schools may not receive public funds for the students. RCW 28A.710.220(1) ("Charter schools must comply with applicable reporting requirements to receive state . . . funding that is distributed based on student characteristics.").

"Enrolled student," in turn, is defined by WAC 392-121-106.[9] The definition for "enrolled students" expressly includes students enrolled in public charter schools. WAC 392-121-106(1)(g).

---

[9] Chapter 392-121 WAC relates to the superintendent of public instruction's authority to adopt rules for the financial apportionment of state moneys for the operation of public schools. WAC 392-121-003. The chapter is authorized, in part, by the CSA. WAC 392-121-001 (RCW 28A.710.040(5) provides authority for charter schools to be subject to supervision of the superintendent of public instruction to the same extent as public schools, unless otherwise provided in the CSA). Impact does not argue that chapter 392-121 WAC is inapplicable to charter schools.

And this enrolled student definition also includes students to be entered in kindergarten. WAC 392-121-106(2). The chapter further defines "kindergarten":

> As used in this chapter, "kindergarten" means an instructional program conducted pursuant to RCW 28A.150.220 for *students who meet the entry age requirements pursuant to chapter 392-335 WAC*.[10]

WAC 392-121-10601 (emphasis added).

The destination following this trail of regulations is the conclusion that in order to receive public funding for enrollment in kindergarten, charter schools are required to follow "the entry age requirements . . . [of] chapter 392-335 WAC." WAC 392-121-10601. Impact's argument that these requirements of chapter 392-335 WAC do not apply to it because the chapter is not specifically enumerated as applicable to charter schools fails to address this connective analysis of the statutes and regulations that do, unquestionably, link their application to charter schools.

### B. WAC 392-335-025 REQUIRES SCREENING FOUR-YEAR-OLDS INTO KINDERGARTEN

Once it is concluded that the kindergarten "entry age requirements" of chapter 392-335 WAC apply to charter schools, including Impact, we turn to whether Impact violated them by enrolling four-year-old students in its kindergarten classes.

The age requirements for kindergarten under chapter 392-335 WAC are found in the combined reading of two rules. First, WAC 392-335-010 establishes a "uniform entry age for kindergarten":

---

[10] Impact argues this definition is designed to specify the programmatic characteristics of kindergarten and it does limit enrollment of students based on age. We disagree. The plain wording of the provision, defining kindergarten with specific reference to "entry age requirements," belies Impact's position.

> Except as provided in WAC 392-335-025, a child must be five years of age as of midnight August 31 of the year of entry to be entitled to enter kindergarten.

Second, WAC 392-335-025 provides for an exception to the requirement that kindergarteners be five years old:

> School districts may adopt regulations that provide for individual exceptions to the uniform entry qualifications established by this chapter. Such regulations *shall provide for a screening process* and/or instrument(s) which measure the ability or the need, or both, of an individual student to succeed in earlier entry.

(Emphasis added.)

Simply put, the WACs only allow enrollment of four-year-olds into kindergarten if the students are screened based on ability and/or need of the student.

This conclusion creates a conundrum for a charter school like Impact. As seen above, both the CSA and Impact's charter contract prohibit screening students on ability or need of the student. RCW 28A.710.050(1) (charter schools may not limit admission and enrollment to the school on any basis "other than age group, grade level, or enrollment capacity"); AR at 61 ("There shall be no admission testing or other evaluation required of any applicant."). Yet such screening is required before state moneys may be received for enrolling four-year-olds in kindergarten.

In the end, Impact was left with no viable option to enroll four-year-olds in its kindergarten classes. Enrollment of these young students *without screening* violated the entry age restrictions; enrollment *with screening* violated the CSA and Impact's charter contract.

17

Accordingly, the Commission's issuance of the corrective actions on the basis that Impact impermissibly enrolled four-year-olds as EEK students was not outside its authority or arbitrary and capricious.[11]

IV. IMPACT'S DISREGARD OF THE COMMISSION'S DENIAL OF TK

Impact next argues that the Commission's corrective actions incorrectly asserted Impact disobeyed the Commission's decision to not allow TK classes at SSE. The Commission's full statement on this issue was that "Impact disregarded the Commission's denial of TK . . . by enrolling approximately 60 students who were not yet age five . . . (most of whom had previously been screened into TK)." AR at 805.

Impact makes the straightforward point that it could not have disobeyed this decision because it never actually offered TK classes—admitting four-year-olds as EEK students in kindergarten is not same thing as offering TK classes.

But the overlap is significant. As shown above, when the Commission notified Impact that it could not offer TK, it merely created two additional kindergarten classes. Impact then contacted the families of the TK enrollees and shifted those same students from enrollment in TK to kindergarten as EEK students. Even though the Commission expressed concerns with the enrollment of four-year-olds, Impact enrolled those same four-year-olds, but under a different program label.

---

[11] Impact additionally argues that the Commission's corrective action was contrary to the CSA's general purpose of recognizing charter schools' autonomy. However, as explained above, the Commission was within its statutory authority to ensure Impact's compliance with laws and the charter contract. When the Commission was acting within its statutory authority by issuing the corrective actions on specific violations, Impact's reference to the general policy of school autonomy is unavailing.

Given these decisions, Impact interprets the Commission's language about disobeying the Commission too narrowly. The reasons for the Commission's concern with TK students were the same as with EEK students. First, Impact's request to offer TK was denied because there was no regulatory framework to support TK. Second, the Commission believed preauthorization was required to offer TK because the "Commission and Impact did not contemplate TK as an option when Impact applied to the Commission to open SSE and when Impact signed the SSE charter contract." AR at 434. Third, the Commission cited a need to draft policies to resolve the apparent conflict between the need to screen students into TK classes with the prohibition on charter schools of screening students.

Each of those reasons applies equally to EEK enrollment. Just like for TK, there was no regulatory framework in place for charter schools to offer EEK enrollment for four-year-olds, and EEK enrollment was not initially contemplated when drafting and signing the charter contract. And critically, the same issues regarding impermissible screening for TK and EEK enrollment exist. Both options for enrollment of these students require screening to determine if the student is a good fit for and eligible to participate in the programs.

Because the concerns raised by the Commission are identical for both TK and EEK enrollment, the language used by the Commission for this deficiency was broad enough to capture Impact's enrollment of the EEK students. Therefore, the Commission was not willful and unreasoned in its assertion that Impact disobeyed its denial of Impact's plans to offer TK.

No. 57035-1-II

CONCLUSION

Impact fails to show that the Commission acted arbitrarily and capriciously or outside of its statutory authority when it issued the corrective actions against Impact. Therefore, Impact is not entitled to relief under the APA.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

MAXA, P.J.

____, J.